**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
NANOBEAK BIOTECH INC.,              :
                                            :

                              :  **Case No. 21-cv-**

                    Plaintiff,    :

                              :  **Removed from the New York**

     -against-                  :  **State Supreme Court, New York**

                              :  **County, Index No. 652646/2021**

JAMES JEREMY BARBERA,        :
                                            :

                    Defendant.  :
                                            :
------------------------------------------------------------------X

## <u>NOTICE OF REMOVAL</u>

TO:    THE JUDGES OF THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK

       Yann Geron, the Chapter 7 Trustee (the "<u>Trustee</u>") for the estate of Nanobeak Biotech Inc.

("<u>Nanobeak</u>" or the "<u>Debtor</u>"), by and through his undersigned counsel, hereby files this notice (the

"<u>Notice of Removal</u>") pursuant to 28 U.S.C. §§ 1334 and 1452 and Rule 9027 of the Federal Rules

of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") to remove to this Court the action pending in

New York State Supreme Court, New York County, under Index No. 652646/2021 (the "<u>D&O</u>

<u>Action</u>") and respectfully represents as follows:

## <u>BACKGROUND</u>

       1.      Prior to its bankruptcy filing, Nanobeak developed technologies focused on the

detection of early-stage lung cancer.  From August 2009 to October 2019, James Jeremy Barbera

("<u>Barbera</u>") was Nanobeak's Chief Executive Officer.

       2.      A forensic accounting review prepared for Nanobeak revealed that, from 2014 to

2019, Nanobeak received approximately $14 million from investments and other sources.  During

this same time period, only $4.7 million in apparently legitimate business expenses was discovered. As alleged by Nanobeak, the U.S. Securities and Exchange Commission (the "SEC") and the United States Attorney, it appears that Barbera used Nanobeak as his own personal piggy bank and converted Nanobeak's funds for his own personal benefit, leaving less than $14,000 in Nanobeak's bank account when he resigned.

3.    As a result of Barbera's alleged participation in a scheme to defraud dozens of Nanobeak's investors by soliciting investments through false and misleading statements, failing to use the investors' funds as promised, and converting investors' money for his own use, Barbera was arrested on December 9, 2020 and is facing charges filed by the United States Attorney, and is a defendant in two (2) separate civil actions commenced by Nanobeak and the SEC.  Both civil actions are currently stayed pending resolution of the criminal case, where trial is scheduled to commence on January 31, 2022.

4.    On April 20, 2021, Nanobeak commenced the D&O Action against Barbera in the Supreme Court of the State of New York, County of New York (the "State Court") asserting the following causes of action:  (1) breach of fiduciary duty; (2) fraud; (3) conversion; and (4) accounting and imposition of a constructive trust.  *See See Nanobeak Biotech Inc. v. James Jeremy Barbera*, Index No. 652646/2021 (N.Y. State Supreme Court, Apr. 20, 2021).[1]

5.    On June 4, 2021, Barbera moved for a stay of the D&O Action pursuant to CPLR § 2201, or alternatively, for an order dismissing Counts II and III of the complaint pursuant to CPLR § 3211(a)(7).

---

[1] Nanobeak had previously commenced a similar action against Barbera with this Court asserting the same state law claims as in the D&O Action and an additional claim for violation of the United States Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(2)(C), 1030(g).  The Court dismissed the federal claim and declined to exercise supplemental jurisdiction over the remaining state law claims.  *See Nanobeak Biotech Inc. v. James Jeremy Barbera*, Case No. 20-CV-7080 (LLS), *Opinion & Order* at Docket No. 15 (S.D.N.Y. Apr. 13, 2021).

6.      On September 10, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The case number for Nanobeak's chapter 7 case is Chapter 7 Case No. 21-11600-MG (the "Bankruptcy Case"). The Bankruptcy Case is pending before the Honorable Martin Glenn, United States Bankruptcy Judge.

7.      On or about the Petition Date, Yann Geron was appointed interim trustee of the Debtor's estate. On October 8, 2021, the Trustee presided over the first meeting of creditors conducted pursuant to section 341(a) of the Bankruptcy Code and duly qualified and became the permanent trustee by operation of section 702(d) of the Bankruptcy Code.

8.      On or around September 15, 2021, the Trustee, on behalf of the Debtor's estate, Nanobeak and Barbera entered into a stipulation and proposed order staying the D&O Action pursuant to CPLR § 2201 until such time as (i) the criminal action has concluded or (ii) the State Court determines that continuing the stay is no longer proper. *See* D&O Action, Proposed Stipulation at Docket No. 19.

9.      Removal of the D&O Action is appropriate because this Court maintains "related to" bankruptcy jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 1452(a).

## JURISDICTION

10.      Pursuant to 28 U.S.C. § 1452, "[a] party may remove any claim or cause of action . . . to the district court where such civil action is pending, if the district court has jurisdiction of such claim or cause of action under section 1334 of this title." 28 U.S.C. § 1452(a).

11.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1334(b), which provides that United States district courts shall have jurisdiction over all civil proceedings, "arising under", "arising in", or *"related"* to cases under the Bankruptcy Code.

12.     The Second Circuit employs an "expansive test for 'related to' jurisdiction articulated by the Third Circuit in *In re Pacor, Inc.*." *In re Refco, Inc. Sec. Litig.*, 628 F. Supp. 2d 432, 437 (S.D.N.Y. 2008). "The test . . . is whether [the litigation's] outcome might have any 'conceivable effect' on the bankrupt estate." *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 114 (2d Cir. 1992); s*ee also In re Pacor*, 743 F.2d 984, 994 (3d Cir. 1984) ("[T]he test for determining whether a civil proceeding is related to bankruptcy is whether the *outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*."). "Proceedings 'related to' the bankruptcy include . . . causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541 . . . ." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n. 5, 115 S. Ct. 1493, 131 L.Ed.2d 403 (1995).

13.     The causes of action in the D&O Action are "related to" the Bankruptcy Case because Nanobeak seeks, among other things, a judgment against Barbera awarding compensatory damages in favor of Nanobeak in an amount no less than $5,204,572.82, plus interest thereon, which would certainly have a conceivable effect on the Bankruptcy Case. A judgment obtained against Barbera could be the largest asset of the Bankruptcy Case. Any collection on the judgment would provide recoveries to the Debtor's creditors. Accordingly, this Court has jurisdiction over the D&O Action pursuant to 28 U.S.C. § 1334(b).

14.     Further, 28 U.S.C. § 1334(e) provides that the "district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction . . . of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate .

. . ." The causes of action asserted by Nanobeak in the D&O Action are now property of the Debtor's estate, to be prosecuted by the Trustee for the benefit of the Debtor's creditors.

15.     Upon removal to this Court, the D&O Action should then be referred to the Bankruptcy Court. *See* Amended Standing Order of Reference, 12 Misc. 32 (S.D.N.Y. Preska, C.J.), dated January 31, 2012 ("any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 are referred to the bankruptcy judges for this district.").

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

16.     Pursuant to Bankruptcy Rule 9027:  (a) this Notice of Removal is being filed with the clerk for the district and division within which the D&O Action is pending; (b) this Notice of Removal is signed pursuant to Bankruptcy Rule 9011 and contains a short and plain statement of the facts which entitle the Trustee to remove the D&O Action; (c) the Trustee consents to entry of final orders or judgment by the Bankruptcy Court; (d) this Notice of Removal is being timely filed; (e) this Notice of Removal is accompanied by a copy of all pleadings filed to date in the D&O Action, attached hereto as Exhibits A-T; and (f) the Trustee has contemporaneously filed a copy of this Notice of Removal with the Clerk of the Supreme Court of the State of New York, County of New York and shall promptly serve a copy of this Notice of Removal upon Barbera's counsel.

*[Continued on Next Page]*

**WHEREFORE**, the Trustee removes the D&O Action in its entirety from the Supreme Court of the State of New York, New York County to the United States District Court for the Southern District of New York and respectfully submits that the matter should be referred to the United States Bankruptcy Court for the Southern District of New York.

Dated:   New York, New York
          December 9, 2021

<div align="center">

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**

</div>

By:  */s/ Lauren C. Kiss*
      Fred Stevens
      Lauren C. Kiss
      200 West 41st Street, 17th Floor
      New York, New York 10036-7203
      Tel: (212) 972-3000
      Fax: (212) 972-2245
      Email: fstevens@klestadt.com
            lkiss@klestadt.com

*Special Litigation Counsel to Yann Geron, the Chapter 7 Trustee of the Estate of Nanobeak Biotech Inc.*

# Exhibit A
# D&O Action Docket
# in State Court





# *WebCivil Supreme - eFiled Documents Detail*

Court:                **New York Supreme Court**
Index Number:   **652646/2021**
Case Name:       **NANOBEAK BIOTECH INC. vs. BARBERA, JAMES JEREMY**
Case Type:        **Comm-Other**
Track:                **Complex**

## Document List - Click on the document name to view the document

| Document # | Date Received/Filed | Document | Description | Motion # | Filing User |
|---|---|---|---|---|---|
| 1 | 04/20/2021 | SUMMONS + COMPLAINT | --none-- | | PAUL CURRAN KINGSBERY |
| 2 | 04/20/2021 | RJI -RE: REQUEST FOR PRELIMINARY CONFERENCE | --none-- | | PAUL CURRAN KINGSBERY |
| 3 | 04/20/2021 | ADDENDUM - COMMERCIAL DIVISION (840C) | --none-- | | PAUL CURRAN KINGSBERY |
| 4 | 04/23/2021 | AFFIRMATION/AFFIDAVIT OF SERVICE | Affidavit of Service of Summons and Complaint, RJI, Commercial Addendum and Notice of Electronic Filing | | PAUL CURRAN KINGSBERY |
| 5 | 05/26/2021 | STIPULATION - TIME TO ANSWER | Stipulation re Defendant J. Barbera's Response to Complaint | | ADAM DAVID COLE |
| 6 | 06/04/2021 | NOTICE OF MOTION | Defendant James Jeremy Barbera's Notice of Motion to Stay or Dismiss | 001 | ADAM DAVID COLE |
| 7 | 06/04/2021 | AFFIDAVIT OR AFFIRMATION IN SUPPORT | Affirmation of Adam D. Cole, Esq. in Support of Motion to Stay or to Dismiss | 001 | ADAM DAVID COLE |
| 8 | 06/04/2021 | EXHIBIT(S) | Exhibit A Copy of the Complaint, filed April 20, 2021 | 001 | ADAM DAVID COLE |
| 9 | 06/04/2021 | EXHIBIT(S) | Exhibit B Copy of the Criminal Complaint, filed December 9, 2020 | 001 | ADAM DAVID COLE |
| 10 | 06/04/2021 | EXHIBIT(S) | Exhibit C - Copy of the Indictment, unsealed March 8, 2021 | 001 | ADAM DAVID COLE |
| 11 | 06/04/2021 | MEMORANDUM OF LAW IN SUPPORT | Defendants Memorandum of Law in Support of Motion to Stay or Dismiss | 001 | ADAM DAVID COLE |
| 12 | 06/15/2021 | STIPULATION - ADJOURNMENT OF MOTION -IN SUBMISSIONS PART - RM 130 | --none-- | 001 | PAUL CURRAN KINGSBERY |
| 13 | 07/15/2021 | STIPULATION - OTHER - ( REQUEST TO SO ORDER ) | STIPULATION AND [PROPOSED] ORDER REGARDING BRIEFING SCHEDULE FOR DEFENDANTS MOTION TO STAY OR DISMISS | 001 | PAUL CURRAN KINGSBERY |
| 14 | 07/19/2021 | STIPULATION - SO ORDERED | --none-- | 001 | Herbet Z. Rosen *court user* |
| 15 | 07/19/2021 | STIPULATION - ADJOURNMENT OF MOTION -IN SUBMISSIONS PART - RM 130 | --none-- | 001 | PAUL CURRAN KINGSBERY |
| 16 | 08/16/2021 | STIPULATION - OTHER - ( REQUEST TO SO ORDER ) | Proposed Stipulation re Barbera Motion to Stay or Dismiss | 001 | PAUL CURRAN KINGSBERY |
| 17 | 08/18/2021 | STIPULATION - SO ORDERED | --none-- | 001 | Sharon Hill *court user* |
| 18 | 08/18/2021 | STIPULATION - ADJOURNMENT OF MOTION -IN SUBMISSIONS PART - RM 130 | --none-- | 001 | PAUL CURRAN KINGSBERY |
| 19 | 09/15/2021 | STIPULATION - OTHER - ( REQUEST TO SO ORDER ) | Stipulation and [Proposed] Order Staying | 001 | PAUL CURRAN |

KINGSBERY

Close

# Exhibit B
Docket No. 1 in
D&O Action

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF  New York

------------------------------------------

NANOBEAK BIOTECH INC.,

Plaintiff(s),

-*against*-

JAMES JEREMY BARBERA,

Defendant(s).

------------------------------------------

Index No.

𝕾𝖚𝖒𝖒𝖔𝖓𝖘

Date Index No. Purchased:  April 20, 2021

To the above named Defendant(s)

James Jeremy Barbera
104 West 70th Street, Apt. 11B
New York, NY 10023

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is  the residence of Defendant James Jeremy Barbera
which is  104 West 70th Street, Apt. 11B, in New York, New York 10023.

Dated:  New York, New York

April 20, 2021

DECHERT LLP

by _____
Paul Curran Kingsbery
Attorneys for Plaintiff
Nanobeak Biotech Inc.

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
+1 212 641 5663
paul.kingsbery@dechert.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------- :
                                                              :
NANOBEAK BIOTECH INC.,                                        :
                                                              :          Index No. _____
                                        *Plaintiff*,          :
                                                              :
        – against –                                          :
                                                              :          **COMPLAINT**
JAMES JEREMY BARBERA,                                         :
                                                              :
                                                              :          **JURY TRIAL DEMANDED**
                                        *Defendant*.          :
                                                              :
------------------------------------------------------------- :

Plaintiff Nanobeak Biotech Inc. ("Nanobeak" or the "Corporation"), for its Complaint

against Defendant James Jeremy Barbera ("Barbera") states as follows:

## NATURE OF THE CLAIMS

1.      Nanobeak is a privately held corporation that develops technologies focused on

the detection of early-stage lung cancer. From August 2009 until his resignation under pressure

from the Nanobeak's board of directors and stockholders in October 2019, Barbera was

Nanobeak's Chief Executive Officer.  Following his resignation as CEO, Barbera served as

Nanobeak's Chief Science Officer ("CSO") until his suspension in December 2019 and

ultimately his removal from that position by the Board on April 3, 2020. Barbera also served as a

member of Nanobeak's board of directors (the "Board") from August 2009 until March 2020,

when Nanobeak's stockholders removed him from the Board.

2.      Through this action, Nanobeak seeks redress for Barbera's theft of the

Corporation's assets, his gross dereliction of his fiduciary duties as an officer and director of the

Corporation, his diversion of Nanobeak investor funds to his own personal bank accounts, and

his unlawful refusal to return Nanobeak's computer systems and its books and records. Nanobeak further seeks a full accounting of Barbera's handling of its corporate assets.

3.      A forensic accounting review commissioned by the Corporation after Barbera resigned as the CEO determined that, from 2014 through 2019, Nanobeak received a total of $14,316,451.86—from debt and equity investments and transfers from a subsidiary. At the time of Barbera's resignation, the Corporation's bank account had a balance of $13,979.77. In the 2014 through 2019 time period, the forensic accounting review could only confirm $4,706,907.07 in apparently legitimate business expenditures.

4.      Barbera treated Nanobeak as his own personal "piggy bank." While Barbera has not permitted the Corporation to access many records from 2009 to 2013, the records to which the Corporation does have access establish that, from 2014 through 2019, Barbera converted $4,264,325.31 of Nanobeak's funds for his own personal expenses (the "Personal Expenses") without the knowledge or approval of the Board. The Personal Expenses comprise a total of more than 7,800 transactions and included expenditures for the mortgage on a home Barbera owns with his ex-wife and for his luxury apartment, cash withdrawals, transfers to Barbera's family members and ex-wife, tuition for his children, and payments for Barbera's personal automobile and automobiles for others. During the same time period, Barbera converted an additional $131,707.23 of Nanobeak's funds to pay legal and other expenses related to his incorporation of other entities that had no connection to Nanobeak's business (the "Personal Legal Expenses"). Additionally, between November 2018 and February 2019, Barbera made a series of international wire transfers that totaled $128,500 to a person located in the Ukraine through Privatbank Ukraine (the "Ukraine Transfers") that appears to have served no legitimate Nanobeak business purpose.

– 2 –

5. Barbera perpetuated his fraud by providing false financial statements to the Board that falsely inflated Nanobeak's reported legitimate business expenses to conceal that he was taking money out of the Corporation for his personal use.

6. Barbera also mismanaged the affairs of the Corporation and engaged in acts of clear corporate waste—in violation of his fiduciary duty of care—throughout his tenure as CEO. Between 2016 and 2019, Barbera, purportedly on behalf of the Corporation, entered into a series of wasteful "merchant advance" agreements that, while superficially characterized as advances against Nanobeak's expected receivables, functioned as loans at exorbitant interest rates because Nanobeak had no receivables during that time period. The apparent purpose of these agreements was to perpetuate Barbera's conversion of Nanobeak's assets, not to raise funds for legitimate business activities. Based on information currently known to the Corporation, these merchant advance agreements caused it to make wasteful expenditures of at least $680,040.28 (the "Merchant Advance Losses").

7. While a large portion of the $9,609,544.79 of expenditures without any clear business justification were for the Personal Expenses, the Personal Legal Expenses, the Ukraine Transfers, and the Merchant Advance Losses, Nanobeak lacks sufficient information to determine whether the remaining $4,404,971.97 (the "Unknown Expenses") was spent on legitimate business expenses because Barbera has refused to provide the Corporation with access to its full and complete books and records (the "Books and Records").

8. In addition to his outright theft from the Corporation, Barbera was completely ineffective at managing Nanobeak's business. As explained in further detail below, Barbera's conduct contributed to protracted delays in a study that Nanobeak had commissioned with a major research university. Facing intense pressure from the Board and Nanobeak stockholders

– 3 –

due to the Corporation's deteriorating financial condition and his inability to accomplish the

Corporation's development objectives, Barbera resigned as Nanobeak's Chief Executive Officer

in October 2019.

9.      Following Barbera's resignation, the Board appointed a new interim CEO, who

began an informal review of Barbera's management of Nanobeak and requested that Barbera

return all Nanobeak corporate records. Barbera refused to return the Books and Records, and in

December 2019, the Board suspended Barbera from his position as CSO and engaged a law firm

and forensic accounting firm to review the corporate records then available. After this review

determined that Barbera had engaged in serious misconduct, Nanobeak severed all ties with

Barbera in April 2020. Throughout the forensic accounting review and following his termination,

the Corporation requested that Barbera return, in addition to the Books and Records, all other

corporate property in his possession—including certain confidential information of high value to

the Corporation. Barbera continues to refuse to provide the Books and Records or to return

Nanobeak's confidential information or computer systems.

10.     By holding the Books and Records and other property of the Corporation hostage,

Barbera has breached his fiduciary duties to the Corporation as an officer and director.

11.     Nanobeak has also discovered evidence that, while CEO, Barbera diverted

investor funds to accounts in the name of two entities that he created with names confusingly

similar to Nanobeak. Based on information currently available to the Corporation, it is not clear

whether Barbera ultimately used these other entities to convert funds meant to be invested in

Nanobeak to his own use.

12.     The purpose of this action is to recover damages for Barbera's conversion of

assets and breaches of fiduciary duties, as well as all corporate property that Barbera stole from

Nanobeak or has wrongfully retained, including corporate records necessary to determine the full

extent of harm caused by Barbera's misconduct.

## PARTIES

13.    Plaintiff Nanobeak is a closely held corporation organized under the laws of

Delaware with its principal place of business in New York. Nanobeak was originally formed as a

California corporation in 2009, but was converted into a Delaware limited liability company in

2014, and later into a Delaware corporation under the name "Nanobeak, Inc." in 2015. In July

2019, the Corporation's name was changed to "Nanobeak Biotech Inc."—its current legal name.

14.    Defendant Jeremy Barbera is a natural person who, on information and belief, is a

citizen of the State of New York and has resided in New York, New York at all times relevant to

this Complaint. Barbera was the incorporator of Nanobeak and served as a director and its CEO

from 2009 through October 2, 2019. Following Barbera's resignation as CEO, he continued to

serve as a director and the Corporation's CSO until his removal from those positions in March

2020 and April 2020, respectively. Barbera was removed as a director of Nanobeak by a written

stockholder consent on March 25, 2020, and from his position as CSO by the Board through a

resolution dated April 3, 2020.

## JURISDICTION AND VENUE

15.    This Court has personal jurisdiction over Barbera pursuant to CPLR § 301.

Defendant resides and conducts business in New York County and committed tortious acts in

New York County.

16.    Venue is proper in New York County pursuant to CPLR § 503(a) because

Defendant Barbera resides in New York County.

## BACKGROUND

I.   **Nanobeak's Founding and Early Corporate History**

17.   In 1987, Barbera became the Chief Executive Officer of Metro Services Group, Inc., a corporation that developed information-based services used in direct marketing and fundraising campaigns. In October 1996, Metro Services Group, Inc. was acquired by All-Comm Media Corporation, a corporation that provided database management services, custom telemarketing services and other direct marketing services to U.S. customers. Barbera thereafter served as a director and Vice President of All-Comm while continuing to serve as the CEO of Metro. In 1997, All-Comm's name was changed to "Marketing Services Group, Inc.," and Barbera became its CEO. Eventually, Marketing Services Group, Inc. was renamed "MSGI Technology Solutions, Inc." ("MSGI").

18.   MSGI's stock was publicly traded on the OTC Bulletin Board.

19.   In October 2009, the National Aeronautics and Space Administration ("NASA") announced a partnership with MSGI, then operating under the name "MSGI Security Solutions, Inc.," to develop solar cell technology and technologies to detect gas and organic vapors found in human breath.

20.   In August 2009, Barbera formed Nanobeak, Inc. as a California corporation. He caused MSGI to describe Nanobeak as a "subsidiary" in MSGI's public filings with the SEC, but, records obtained from the California Secretary of State indicate that Nanobeak was owned entirely by Barbera at the time of its formation. As stated in MSGI's SEC filings, the purpose of Nanobeak was to develop, and eventually market, gas and organic vapor-detection technology licensed from NASA. Specifically, MSGI announced that Nanobeak was working to develop a handheld screening test for diabetes that functioned by measuring the acetone levels of subjects' breaths, with the intent of replacing blood tests. That product was never developed.

– 6 –

21.     On June 7, 2011, the SEC issued an order temporarily suspending trading in MSGI's securities due to questions about the adequacy and accuracy of publicly available information about MSGI and other "microcap" stocks.

22.     In July 2014, the SEC filed an action in this Court against MSGI and Barbera, alleging that, starting in around 2008, MSGI's business had declined, but Barbera concealed the true state of MSGI's financial condition from its investors. The SEC alleged that, while Barbera had "portray[ed] MSGI as a rapidly growing and hugely promising technology venture, MSGI remains essentially dormant with little or no capital." The SEC charged Barbera with engaging in a "fraud that materially misled investors about the true business operations and finances of MSGI." Barbera settled those charges with the SEC. He neither admitted to nor denied the SEC's charges, but agreed to pay a $100,000 penalty and to a bar on serving as an officer or director of a public company or participating in any future "penny stock" offerings.

23.     In August 2014—less than three days after the settled charges relating to MSGI were announced—Nanobeak, which had originally been formed as a California corporation, was merged into a newly created Delaware limited liability company, Nanobeak LLC.

24.     In November 2015, Nanobeak was converted into a Delaware corporation, and its name was changed to Nanobeak Biotech, Inc. in July 2019.

25.     The SEC revoked the Exchange Act registration of MSGI on December 18, 2015.

## II.     Nanobeak's Efforts to Develop Breath Analysis Technologies

26.     From Nanobeak's formation in August 2009 until Barbera's resignation in October 2019, Barbera was Nanobeak's CEO. At all times relevant to this complaint, Barbera managed the Corporation out of its principal office in New York, New York and had sole control over Nanobeak's bank accounts.

– 7 –

27.     During his tenure as CEO, Barbera's mismanagement contributed to sustained delays in the development of the breath analysis technologies and effectively prevented Nanobeak from bringing its planned screening product to market.

28.     In December 2013, Nanobeak completed a partially exclusive master licensing agreement with NASA granting Nanobeak a license to patents numbered US 7426848 B1, US 76233972 B1, US 7801687 B1, and US 8000903 B1. This license agreement is and remains valuable to Nanobeak because it permits the corporation to use and develop, among other things, breath analysis screening technologies. In December 2015, NASA and Nanobeak agreed to extend the term of this licensing agreement to December 31, 2021.

29.     Under the license agreement with NASA, Nanobeak agreed to certain "milestones" for the development of breath screening products. These milestones included conducting clinical trials for the detection of cancer in a hospital setting by the first quarter of 2015 and the formalization of sales and marketing channels for screening products by the fourth quarter of 2015. Nanobeak did not achieve these milestones on the schedule contemplated in the original license agreement. The December 2015 extension of the license agreement provided for modified development milestones. The clinical trial milestone was extended to 2017 and the formalization of sales and marketing channels milestone was extended to 2020. None of these milestones were met.

30.     Starting in October 2016, Nanobeak entered into a series of agreements with a nationally recognized research university ("University A") to research the use of volatile organic compounds ("VOCs") to detect lung cancer and then to sponsor a clinical trial as contemplated in the NASA license agreement. In exchange for payments from Nanobeak, a division of University A ("Division A") agreed to conduct a research program to design the experiment and

– 8 –

analyze the data (the "Confirmation Study"). Later, another division of University A ("Division B") agreed to conduct an additional study (the "Development Study") comparing the VOC levels in lung cancer patients with those of healthy individuals and to perform statistical analyses. The purposes of these studies were to confirm the ability of certain VOC "signatures" to diagnose Stage 1 lung cancer and to develop new VOC signatures. Information about these signatures was valuable to Nanobeak because it could be used in combination with the NASA-licensed technology to develop early stage lung cancer screening technologies.

31.    The agreement between Nanobeak and Division A of University A contemplated that University A's "performance period" for the Confirmation Study would run from November 1, 2016, to October 31, 2017. The initial agreement set forth the projected cost of the Confirmation Study, which was later increased in an amended agreement dated December 26, 2016, and payment terms. Due largely to Barbera's mismanagement, Nanobeak failed to comply with the payment terms of the agreement, but Nanobeak and University A agreed to modified payment terms on November 7, 2017. The agreement was amended for a third time on March 19, 2018, to provide for the purchase of special equipment for the study. Nanobeak made the required payments for this equipment six months later than planned, delaying the progress of the trial. At Barbera's direction, Nanobeak continued to violate the payment terms of the amended agreement, and Nanobeak and University A entered into a fourth amendment on October 29, 2018, which provided a new payment schedule. A new payment schedule was provided, but Barbera again caused Nanobeak to make payments late or failed to make payments at all.

32.    The agreement between Nanobeak and Division B of University A contemplated that performance of the Development Study would run from June 1, 2017 to May 31, 2018. However, as with the Division A agreement, Barbera caused delays by failing to comply with the

payment terms of this agreement. Barbera also violated University A's ethics rules by entering

into a consulting agreement with a University A employee and naming the head of the clinical

trial to Nanobeak's advisory board. As a result of the payment delays and Barbera's unethical

conduct, the project was not ultimately completed until May 2020.

33.    A substantial cause of the payment delays in connection with the University A

agreements was Barbera's theft from Nanobeak. For example, the Corporation owed University

A $147,000 in August of 2019 that Barbera never caused Nanobeak to pay, however during the

10 months preceding and the two months following that date, Barbera caused Nanobeak to pay

personal expenses to him in excess of $925,000. The $147,000 represented only 16% of what he

paid himself. On information and belief, had he directed Nanobeak funds be used to pay

University A instead of diverting money for his personal expenses, the research could have been

completed sooner.

34.    Primarily as a result of the payment delays, University A was not able to complete

its clinical trials until December 2019 and not able to complete its signature development until

May 2020. However, as noted above, an additional cause for the delay was Barbera's

inexplicable and unethical hiring of a University A employee in January 2019. In violation of

University A's ethical rules governing relationships between the university's employees and

clinical trial sponsors, Barbera paid this employee over $10,000 for "consulting services." When

University A discovered the arrangement in July 2019, University A directed the employee to

sever ties with Nanobeak, but Barbera's ethical lapse contributed to a months-long delay in the

finalization of University A's studies.

35.    When Nanobeak finally received the results from University A in May 2020, they

were no longer as valuable as they would have been if they had been received on the originally

contemplated schedule because, among other reasons, Nanobeak lost time that could have been spent on product development.

36.     Starting in April 2019, Barbera began discussions with another research university ("University B"), purportedly to complete the study that University A had started but not yet completed at the time. On information and belief, this was an attempt by Barbera to cover for his mismanagement of the relationship with University A, which had contributed to substantial delays in University A's progress. On October 18, 2019—after he had already resigned as Chairman and CEO of Nanobeak—Barbera purported to execute an agreement with University B to, in effect, continue the work that University A had started. This contract with University B was not known or approved by the Board, but Barbera held himself out as an authorized officer of Nanobeak, despite his prior resignation as Nanobeak's CEO. In addition, Barbera provided University B with confidential information from University A, including the signed University A agreements, the sampling protocol, budgets, and documents relating to the approval of the study by University A's Institutional Review Board. This was done without the knowledge of the Board.

37.     University B did not end up conducting the study, but in the process of planning for and seeking approval for the contemplated study, University B incurred expenses for which Nanobeak was required to reimburse University B.

38.     In or around May 2019, while Barbera was still serving as Nanobeak's CEO and a member of the Corporation's board of directors, he also caused Nanobeak to license information from a research university in Italy ("University C") that could be used to develop a VOC signature for colorectal cancer (the "University C License"). Although he informed the Board and certain Nanobeak investors about the acquisition of this license, Barbera has refused to

– 11 –

provide Nanobeak with the information provided by the University C License or any documents evidencing the license. However, because Barbera purchased this license in the course of his duties as an officer of Nanobeak, the University C License is property of the Corporation, not Barbera's personal property. His refusal to provide the University C License to Nanobeak constitutes unlawful conversion, mismanagement of the Corporation's assets, and a violation of his fiduciary duties of care and loyalty.

### III.  Barbera's Scheme to Defraud Nanobeak and to Convert and Misuse Nanobeak Property

39.     From 2014 and continuing through to his resignation as CEO, Barbera plundered Nanobeak's bank accounts. He used Nanobeak's money to pay his personal expenses the day before his resignation, the day of his resignation and continued until the bank account was overdrawn. As Barbera knew that he was taking the Corporation's assets without any legal entitlement to the same, this course of conduct constituted unlawful conversion, as well as a gross breach of his fiduciary duties of care and loyalty. Barbera knew that taking millions of dollars from the Corporation would threaten the Corporation's ability to develop technology and market diagnostic products, but placed his own personal interests above the Corporation's and its shareholders' interests.

### A.     Barbera's Conversion of Nanobeak Funds

40.     Between January 1, 2014 and October 2, 2019, Nanobeak's main bank account received a total of $14,316,451.86 in cash inflows from all sources, including equity investments, loans, and convertible debt instruments. By the date of his resignation the bank account had $13,979.77 and within three days the balance was -$3,918.48 Nanobeak generated no revenue from its business operations in any year.

41.     Based on information currently known to Nanobeak, only $4,706,907.07—or just 32.8% —of the total inflows for the 2014 through 2019 time period were spent on legitimate business expenses, including for payments due to NASA under the license agreement, payments to University A, and legitimate consulting fees.

42.     Of the remaining $9,609,544.79 received by Nanobeak, Barbera caused Nanobeak to spend $4,264,325.31 on the Personal Expenses, which included, among other things, mortgage payments for Barbera's residence he owns with his ex-wife that is located in New York City ($299,726.59), payments for a luxury apartment in New York City ($659,491.16), cash withdrawals from Nanobeak's bank account ($985,257.51), fund transfers to Barbera's family members and ex-spouse ($771,240.87), payments to schools including tuition for Barbera's children ($159,230.44), jewelry, gifts and entertainment ($206,236.05) and personal automobile expenses ($110,254.40). The Personal Expenses comprised 7,862 separate expenditures between January 1, 2014, and October 2, 2019.

43.     Barbera also caused Nanobeak to spend $131,707.23 for the Personal Legal Expenses. These payments were made for corporate formation expenses and legal fees for businesses unrelated to Nanobeak, except that they were formed and controlled by Barbera, without the knowledge of the board. Specifically, the payments were made from Nanobeak's bank account to the Corporation Service Company and several law firms. Barbera caused the Corporation to expend these funds without any legitimate business purpose for the benefit of Nanobeak. The Personal Legal Expenses comprised 38 separate expenditures between January 1, 2014, and October 2, 2019.

44.     Barbera also converted $128,500 of Nanobeak's assets through the Ukraine Transfers. Between November 2018 and February 2019, Barbera executed a series of five

international wire transfers to an unknown person located in the Ukraine through Privatbank

Ukraine with no known legitimate business purpose for the Corporation. On information and

belief, Nanobeak does not have any known license or consulting agreements with persons or

entities located in Ukraine.  Moreover, the records available indicate that the recipient of the

Ukraine Transfers was an individual named "Julia."  Barbera has introduced a Ukrainian

individual named "Julia" to a Nanobeak stockholder as his girlfriend. Therefore, it appears likely

that the Ukraine Transfers were made to Barbera's girlfriend. In any case, because there is no

apparent business purpose for the Ukraine Transfers, this appears to be yet another act of

conversion by Barbera.

45.      As detailed further below in ¶¶ 65–71, the Personal Expenses, the Personal Legal

Expenses, and the Ukraine Transfers were concealed from the Board and potential investors in

Nanobeak's financial statements during Barbera's time as CEO.

46.      In summary, based on the information currently known to Nanobeak, Barbera

spent a total of approximately $4.5 million of Nanobeak's funds—or approximately 31.6% of the

total cash inflows of the Corporation—on personal expenses without any legitimate business

purpose. Barbera's taking of the Personal Expenses, the Personal Legal Expenses, and the

Ukraine Transfers was unlawful and contrary to the true owner's (Nanobeak's) own possessory

rights in its own property.

**B.      Barbera's Wasteful Merchant Advance Contracts**

47.      In addition to Barbera's outright theft and conversion of Nanobeak property, he

also caused it to enter into wasteful borrowing arrangements with merchant advance companies

that imposed punishing interest rates on Nanobeak. While superficially denominated as

"advances" on Nanobeak's "anticipated receivables" from its operations, these agreements

– 14 –

functioned as loans at exorbitant interest rates because, as Barbera knew, Nanobeak had not brought any finished product to market and thus had no receivables from its operations.

48.     Based on the information currently known to Nanobeak, it received a total of $1,068,343.13 from these merchant advance companies, but paid at least $1,748,383.41 in interest and principal payments. Thus, Barbera caused Nanobeak to absorb Merchant Advance Losses of at least $680,040.28.

49.     On information and belief, Barbera entered into additional, unknown loan agreements with merchant advance companies, but as he has refused to provide the full and complete Books and Records, the full impact of Barbera's misconduct is unknown.

50.     Additionally, because the precise details concerning the lending arrangements with the merchant advance companies are contained in Nanobeak's Books and Records, which Barbera has refused to return, it is not possible to determine with precision how much of the $1,748,383.41 was paid in interest as opposed to principal. However, in the course of investigating Barbera after his termination, Nanobeak has obtained copies of the agreements between Nanobeak and two merchant advance companies indicating that the effective interest rate for certain of the agreements exceeded 30% per annum. Accordingly, to the extent certain of the payments Nanobeak has made can be characterized as "interest" rather than "principal" on the agreements, Nanobeak's actual harm from the merchant advance agreements could be substantially larger.

51.     Barbera's decision to enter into those agreements had a substantial negative impact on Nanobeak's financial position. Accordingly, and because those agreements did not serve any legitimate business objective of Nanobeak, they constituted a waste of Nanobeak's assets.

– 15 –

### C. Barbera's Diversion of Investments in Nanobeak

52. Barbera also further violated his fiduciary duties of care and loyalty to Nanobeak by diverting amounts intended to be paid into Nanobeak as equity investments to entities he controlled. The precise extent of the harm to Nanobeak as a result of these diversions of investments is currently unknown because Barbera has wrongfully withheld access to the Books and Records.

53. During his tenure as Nanobeak's Chief Executive Officer, Barbera formed three business entities with names confusingly similar to Nanobeak:

> (i)     Nanobeak Limited, which was formed in May 2014 in the United Kingdom ("Nanobeak UK") and is still active;
>
> (ii)    Nanobeak Fiduciary Group LLC, which was formed in November 2014 in Delaware ("Fiduciary Group") and was cancelled in March 2017; and
>
> (iii)   Nanobeak Ukraine Inc., which was formed in October 2018 in Delaware ("Nanobeak Ukraine") and is still active. Nanobeak Ukraine's name was changed to Nanobeak Biotech II Inc. in 2019 and later to Harmonic Convergence Inc. in 2020.

The board of directors of Nanobeak never authorized the formation of these entities, and they were not owned or controlled by Nanobeak. These entities served no legitimate business purpose for Nanobeak.

54. On three occasions presently known to the Corporation, Barbera directed investments intended for Nanobeak into accounts he created for Nanobeak Ukraine.

55. Barbera established a bank account for Nanobeak Ukraine in February 2019. The bank account was established at the same bank where Nanobeak maintained its operating account.

56. In June 2019, a Nanobeak director intending to make a $300,000 equity investment in Nanobeak asked Barbera to provide wire instructions for payment. Barbera sent

– 16 –

wire instructions that identified "Nanobeak Biotech Inc." as the payee, but included the account number for Nanobeak Ukraine, instead of Nanobeak's actual bank account number. When the director entered the information from Barbera's fraudulent wire instructions and executed the transfer, the result was that money intended for Nanobeak was sent into the Nanobeak Ukraine account, and because Barbera's entity had a name very similar to Nanobeak's actual corporate name at the time, the wire transfer cleared despite the minor discrepancy in the names of the two entities.

57.    On this particular occasion in June 2019, Nanobeak did not suffer a monetary loss because the money was later paid into Nanobeak's operating account. But Barbera never disclosed to the director in advance that he was directing funds to a non-Nanobeak account.

58.    Barbera executed a similar diversion of a $300,000 deposit from a Nanobeak investor into the Nanobeak Ukraine bank account in June of 2019. Again, Nanobeak did not sustain direct financial losses from this diverted investment, but Barbera never disclosed that he was diverting the funds to an entity he controlled and provided fraudulent wire transfer instructions.

59.    Barbera executed a similar diversion of a $125,000 deposit from a Nanobeak investor into the Nanobeak Ukraine bank account August 2019. Barbera never disclosed that he was diverting the funds to an entity he controlled and provided fraudulent wire transfer instructions.

60.    Barbera also executed five transactions totaling more than $190,000 between 2015 and 2018 where shareholder money was diverted to his personal checking account. On these particular occasions, Nanobeak did not suffer a monetary loss because the money was later paid into Nanobeak's operating account. But Barbera never disclosed to the shareholders in

advance that he was directing funds to a non-Nanobeak account. He also did not disclose the transactions to the Board.

61.     During his time as CEO of Nanobeak, Nanobeak Ukraine and Nanobeak Limited UK paid a total of $1,449,507.33 into Nanobeak's operating account. Based on the information currently known to Nanobeak, Barbera had a pattern and practice of diverting invested funds into these entities, which were under his sole control. Because Barbera was a fiduciary of Nanobeak, to the extent he has failed to pay over the full amounts of the intended investments, Barbera is liable to Nanobeak for the full amount of the intended investments. Accordingly, Nanobeak is entitled to an accounting of all investor funds that Barbera routed through these entities.

### D.     Nanobeak's Acquisition of Information Technology Assets

62.     In furtherance of the Corporation's business, Barbera used Nanobeak funds to acquire certain information technology assets during his time as CEO.

63.     Nanobeak acquired two valuable domain names: nanobeak.com and mobilehealthcare.com (the "Nanobeak Domains"). The nanobeak.com domain was purchased by Barbera, as an incorporator and CEO of Nanobeak, in 2009. MobileHealthCare.com was purchased from the owner of that URL for $10,000 in 2016 using Nanobeak funds. Both domains were registered by Barbera within the scope of his duties as an officer of Nanobeak, and he used Nanobeak funds to pay for the purchase and renewals of those domains. Nonetheless, since his resignation as CEO, Barbera has refused to cede control of the Nanobeak Domains to the current officers and directors of Nanobeak, and has claimed them as his personal property. Likewise, even though Nanobeak's funds were used to fund certain webpage and email hosting services based on the nanobeak.com domain through Professional Edge, LLC, Barbera has purported to withhold his consent to transfer the relevant Professional Edge accounts (the "Nanobeak Hosting Accounts") to Nanobeak's current management. The Nanobeak Domains

– 18 –

and the Nanobeak Hosting Accounts are property of the Corporation, and Barbera's refusal to restore that property upon Nanobeak's lawful request constitutes a breach of his fiduciary duties as well as conversion and theft. These email accounts contain valuable information to Nanobeak including contact information, agreements, obligations and other valuable information.

64.     Between January 2014 and July 2019, Nanobeak funds were used to purchase more than $30,000 in computer and other IT equipment (the "Nanobeak Systems"). These computer systems were, at all times, Nanobeak's property. On information and belief, the Nanobeak Systems contain proprietary and confidential information developed by Barbera during his time as a Nanobeak's CEO such as Books and Records of the Corporation, obligations, contact information, agreements and other valuable information (with the University C License, the "Confidential Information"). Since his December 2019 suspension as an officer of Nanobeak, Barbera has refused to return any of the Nanobeak Systems or even full and accurate copies of the documents maintained on those systems. Instead, he has continued to use those systems and exploit the information for his own personal gain, including by frustrating Nanobeak's investigation of his misconduct.

**IV.     Barbera Conceals His Theft by Fraud During his Tenure as Nanobeak's CEO**

65.     During his tenure as Nanobeak CEO, Barbera was responsible for working with accountants retained by the Corporation to prepare financial statements on behalf of the Corporation. Barbera presented these financial statements to the Board and to potential investors, but they did not accurately reflect Nanobeak's financial position.

66.     For example, the balance sheet Barbera provided to the Board dated December 31, 2018, showed liabilities of $8.4 million, however it appears that Nanobeak's liabilities at the time exceeded $14 million. In addition, Barbera inflated the legitimate business expenses that

were reported in order to cover up his fraud and embezzlement. For example, the December 31, 2018 financial statements showed legal fees of $112,007.99, however the available bank records show that the Corporation paid only $22,500 to its counsel—an overstatement of more than 400%. Barbera also reported falsely inflated amounts paid to two legitimate business partners of the Corporation by $186,219.04 and for office space rental by $100,341.75. He also failed to disclose the Ukraine Transfers that had been made as of December 31, 2018, which amounted to $68,500.

67.     Barbera overstated many legitimate business expenses, but he also grossly understated how much he was getting paid by the Corporation.  While the Corporation's review has shown that Barbera received nearly $800,000 from Nanobeak in 2018, Barbera listed Officer and Director Compensation as just $325,541.89.

68.     The Board relied on the accuracy of those financial statements in their supervision of Barbera's management of Nanobeak, and if those financial statements revealed the truth about Barbera's mishandling and conversion of Nanobeak's funds, the Board would have removed him from his position as CEO. Accordingly, but for Barbera's fraudulent statements and omissions in the Corporation's financial statements, he would not have been able to continue his scheme to steal from Nanobeak.

69.     As Barbera knew, the financial statements he presented to the Board did not accurately present Nanobeak's financial position or activities. Based on the records currently available to Nanobeak, the financial statements presented to the Board are contradicted by bank account records.

70.     Other financial statements were presented to potential investors showing that Barbera had received a total of just $1,268,000 in compensation between January 1, 2014 and

December 31, 2018. But as described above, Barbera took a minimum of $4.2 million in compensation in 2014 through 2019.

71.     While Barbera may not have prepared the financial statements himself, he did hire and pay the CFO whom he has worked with before at MSGI for many years. In addition, Barbera was responsible for providing the CFO with the original documents and agreements for the CFO to use in preparing the financial statements. Thus, Barbera either did not provide the CFO with important documents showing the true financial state of the Corporation or the CFO was told to ignore them. In either case, the financial statements were fraudulent and Barbera presented those financial statements to the members of the Board and potential investors in an effort to conceal his misconduct, knowing that if he had disclosed that he was stealing millions of dollars from the Corporation, the Board would have immediately suspended or terminated him.

## V.     Barbera's Unlawful Retention of the Books and Records, the Nanobeak Systems and the Confidential Information

72.     Following Barbera's suspension as CSO in December 2019, the Corporation conducted a forensic accounting review of Barbera's management of Nanobeak based on the limited available banking and financial records, communications with Nanobeak stockholders, and publicly available information. As outlined above, this review has uncovered facts showing that Barbera engaged in serious misconduct while serving as the CEO of Nanobeak.

73.     However, since his resignation, Barbera has consistently refused to return the Books and Records, all of which were in his exclusive possession, custody, and control. Barbera has also refused Nanobeak's request for the return of the Nanobeak Systems and the Confidential Information.

74.     When the Corporation first requested the return of the Books and Records and the Confidential Information, Barbera claimed that he could not return the Nanobeak Systems or the

Books and Records to the Corporation because the computer system he was using had experienced a "hard drive" crash. This explanation was not offered in good faith, because if Barbera actually did experience a "hard drive crash" on his systems, he could have provided any drives from those systems to the Corporation for restoration by a professional data recovery service. Instead, Barbera refused to cooperate with any of Nanobeak's efforts to secure the return of its own rightful property.

75. In fact, Barbera has a history of claiming that important data has been lost as a result of "computer crashes." For example, in April 2015, November 2017, and May 2018, Barbera told other Nanobeak personnel that he was unable to provide data for their use because he had experienced a "crash" of his IT systems in various respects.

76. Furthermore, while still an officer and director, Barbera has formed, or worked with an existing shareholder and another individual to secretly form, three additional business entities with the apparent intent to compete against Nanobeak: Animal Breath Analytics Inc., which was formed in October 2019 as a Florida corporation; Go Blue Biotech, Inc., which was formed in November of 2019 as a Delaware corporation; and JBCSJS LLC, which was formed in January 2020 as a Florida LLC. Additionally, around the time of his removal as a director, Barbera worked with others to form Animal Breath Analytics Corporation, which was formed in March 2020 as a Nevada corporation; (collectively, the "New Business Entities"). Based on Barbera's refusal to return the Books and Records or the Confidential Information, and on information and belief, it appears that Barbera has used or intends to use Nanobeak's Confidential Information for the advancement of these new entities. In addition, on information and belief, Barbera has recently solicited Nanobeak shareholders to invest in his Go Blue Biotech Inc.

77.     Taking into account Barbera's history of claiming that he has lost data through "hard drive crashes," as well as Barbera's formation of the New Business Entities, Barbera's claim that he no longer has access to the Confidential Information or the Books and Records is entirely implausible. Rather, on information and belief, Barbera is wrongfully refusing to return the Books and Records and the Confidential Information, causing substantial harm to Nanobeak

78.     As a fiduciary of Nanobeak who obtained possession of and access to the Books and Records and the Confidential Information based on his position of trust and confidence with the Corporation, his refusal to even restore the Corporation's own information is an extreme deviation from the standards of care, duty, and loyalty expected of members of a corporation's board of directors.

79.     Thus, even if Barbera has not used the Confidential Information to advance the New Entities' business objectives, his wrongful refusal to return it to Nanobeak is a breach of his fiduciary duties of care and loyalty.

## VI.     Nanobeak's Efforts to Recover Funds and Property After Barbera's Termination

80.     Following Barbera's termination as an officer and director, the Corporation transmitted a letter to Barbera requesting that he, among other things, immediately:

(i)     provide the Corporation with access to "ALL bank accounts that include the name Nanobeak or are related to the business of [Nanobeak] in any manner;

(ii)    return all computers, laptops, notebooks, cell phones, and any other technology that contains information relating to [Nanobeak];

(iii)   provide full access to all Nanobeak email accounts; and

(iv)    transfer the University C License back to Nanobeak.

81.     The Corporation also offered to work with Barbera to develop an equitable plan for Barbera to reimburse Nanobeak for all of the funds that he had unlawfully converted. As

– 23 –

proposed by the Corporation, the plan would provide for Barbera to "reimburse [Nanobeak] for [its] funds used (i) to pay expenses to any party that did not relate to [Nanobeak's] business, or (ii) to reimburse [Barbera] or any of [his] affiliates for non-[Nanobeak] business."

82.     The Corporation made this offer to avoid the need for litigation, but Barbera flatly refused the Corporation's reasonable offer of a compromise.

83.     Barbera has failed to even recognize that his conduct was wrongful. Indeed, Barbera has in effect claimed that he lacked any fiduciary duties to Nanobeak and was entitled to use its funds for his own, personal ends. He has specifically claimed, in correspondence to the Corporation, that Nanobeak "was an extension of [him]self" and that "the separation between myself and the company was always somewhat blurred." Thus, Barbera's conduct since his termination, like his conduct as an officer and director of Nanobeak, demonstrates a total and willful disregard for his fiduciary duties to the Corporation.

84.     Despite his termination as a Nanobeak director and officer, Barbera has continued to hold himself out as associated with the Corporation, including on his LinkedIn profile and his personal website. Nanobeak has demanded that Barbera remove any reference to an ongoing relationship with Nanobeak in any communications with investors or the public, but Barbera has wrongfully refused.

85.     On August 31, 2020, Nanobeak commenced litigation against Barbera in the United States District Court for the Southern District of New York (the "Federal Court Action") bringing substantially similar claims as those raised in Counts I–IV of this Complaint as well as a federal statutory claim relating to Barbera's theft of Nanobeak's computer systems.  By order dated April 13, 2021, the Southern District of New York dismissed the federal statutory claim and declined to exercise jurisdiction over the remaining claims asserted in the Federal Court

Action pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the limitations period for any claim asserted in the Federal Court Action was tolled by operation of federal law from August 31, 2020, until May 13, 2021. *See* 28 U.S.C. § 1367(d).

### COUNT I

### **Breach of Fiduciary Duty**

86.     Plaintiff repeats each and every allegation contained above and below as if set forth fully herein.

87.     Upon the formation of Nanobeak and until his termination as a director and officer of Nanobeak in March 2020 and April 2020, respectively, Barbera owed fiduciary duties of care, loyalty, and good faith to Nanobeak.

88.     By using his position as a fiduciary to enrich himself at Nanobeak's expense and enrich third-parties for no legitimate business purpose, Barbera breached his fiduciary duties of care, loyalty, and good faith to Nanobeak.

89.     By stealing, embezzling, and converting Nanobeak's property for his own use and the use of third parties, and by causing Nanobeak to borrow funds from lenders at punitive interest rates, Barbera breached his fiduciary duties of care, loyalty, and good faith to Nanobeak.

90.     Barbera owed fiduciary duties of care and loyalty to the Corporation with respect to all moneys that he raised from Nanobeak investors. Yet, the evidence available to Nanobeak suggests that Barbera converted investor funds by diverting them into non-Nanobeak bank accounts and commingled them with Barbera's own funds. Barbera is liable to the Corporation for the full amount of all funds not returned in breach of his fiduciary duties.

91.     Barbera engaged in this conduct willfully and intentionally, with the knowledge and understanding that it would harm Nanobeak financially, harm its ability to accomplish its business objectives, and damage its ability to raise capital.

92.     Barbera's conduct was willful, wanton and outrageous, thereby justifying an award of punitive or exemplary damages.

## COUNT II

## Fraud

93.     Plaintiff repeats each and every allegation contained above and below as if set forth fully herein.

94.     Upon the formation of Nanobeak in 2009 and until his termination as a director and officer of Nanobeak March 2020 and April 2020, respectively, Barbera owed fiduciary duties of care, loyalty, and good faith to Nanobeak. These fiduciary duties required Barbera to, among other things, deal with Nanobeak and its board of directors truthfully and with candor.

95.     As alleged above, Barbera made misrepresentations to Nanobeak's Board concerning Nanobeak's overall financial position and the payments from the Corporation by which he enriched himself and third parties at the Corporation's expense.

96.     Until his resignation as CEO in October 2019, Nanobeak and its board of directors reasonably relied upon the truth, accuracy, and completeness of Barbera's statements and other representations concerning the financial position of the Corporation in exercising its authority to govern Nanobeak's affairs and, in particular to determine whether Barbera should remain in his position as Nanobeak's CEO.

97.     These misrepresentations and omissions were, individually and in the aggregate, material to the Board's decision to retain Barbera as Nanobeak's CEO and authorize him to act

on behalf of the Corporation. Had the Board been informed of Barbera's conversion and wasteful spending, the Board would have removed him from that position immediately.

98.     Even after Barbera's resignation as Nanobeak's Chief Executive Officer, Barbera refused requests from Nanobeak's new management and its board of directors to return the Books and Records. This refusal to return Nanobeak's own property was deliberately undertaken to prevent Nanobeak and its board of directors from investigating and learning the full truth about Barbera's misconduct.

99.     As a result of Barbera's series of misrepresentations and omissions, Nanobeak has sustained damages resulting directly from Barbera's theft from the Corporation. Nanobeak has also sustained damages in the form of fees for the retention of professionals to investigate Barbera's fraud, which fees were substantially increased as a result of Barbera's concealment of Nanobeak's books and records.

100.    Barbera's conduct was willful, wanton and outrageous, thereby justifying an award of punitive or exemplary damages.

## COUNT III

## Conversion

101.    Plaintiff repeats each and every allegation contained above and below as if set forth fully herein.

102.    At all times relevant, Nanobeak was the true and lawful owner of the funds held in its own bank accounts, the Confidential Information, the Nanobeak Systems, the Nanobeak Domains, the Nanobeak Hosting Accounts, and the Books and Records (the "Nanobeak Property"). Barbera's possessory interests in the Nanobeak Property was entirely contingent on

his status as a fiduciary of Nanobeak, and therefore was subject to the duties of care, loyalty, and good faith imposed by law.

103.    As outlined above, Barbera exercised dominion and control over the Nanobeak Property inconsistent with his limited possessory interest in such property, including by transferring the Nanobeak Property to third parties for no legitimate business purpose, claiming ownership of the Nanobeak Property, and refusing to return the Nanobeak Property upon the demand of the Corporation. Such exercise of dominion and control constituted illegal conversion and theft.

104.    As a direct and proximate result of Barbera's conversion, Nanobeak has sustained substantial damages in an amount to be determined at trial, and in particular by retaining the Books and Records, Barbera has frustrated Nanobeak's attempts to determine the full extent of those damages.

105.    Barbera's conduct was willful, wanton and outrageous, thereby justifying an award of punitive or exemplary damages.

### COUNT IV

### Accounting and Imposition of a Constructive Trust

106.    Plaintiff repeats each and every allegation contained above and below as if set forth fully herein.

107.    From the formation of Nanobeak until his termination as a Nanobeak director and its CSO in March 2020 and April 2020, respectively, Barbera owed fiduciary duties to Nanobeak as a result of his positions as a director and officer of the Corporation.

108.    The amount that Barbera owes to Nanobeak is currently unknown and cannot be ascertained without an accounting from Barbera of the revenues and profits realized by Barbera.

– 28 –

109.     On information and belief, the total amount due to Nanobeak as a result of Barbera's unauthorized personal expenses and corporate waste is at least $5.2 million, representing the total of the Personal Expenses, the Personal Legal Expenses, the Ukraine Transfers, and the Merchant Advance Losses. In addition, Barbera caused Nanobeak to pay the Unknown Expenses, which totaled to $4,404,971.97.

110.     In addition, on information and belief, Barbera has unlawfully retained Nanobeak funds that were paid by investors. As Barbera owed fiduciary duties of care and loyalty to the Corporation with respect to all moneys that he raised from Nanobeak investors, Barbera is liable to the Corporation for the full amount of all funds not paid in full to Nanobeak.

111.     Equity demands that Barbera be required to fully and intelligently account for all revenues and profits realized from the unlawful acts alleged of herein and for Barbera's handling of all Nanobeak property during his time as an officer or director of Nanobeak.

112.     As a result of Barbera's fraudulent conduct, including Barbera's conversion of Nanobeak property, Nanobeak seeks an accounting of Barbera's use of Nanobeak's funds (including for the Personal Expenses, the Personal Legal Expenses, the Ukraine Transfers, the Merchant Advance Losses, and the Unknown Expenses), the imposition of a constructive trust over misappropriated property held by Barbera, and the disgorgement of all profits realized by Barbera from the date of the inception up through and including the present.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.      ordering Barbera to return the Books and Records, as well as all Nanobeak
        Systems and the Confidential Information, to Nanobeak, without retaining any
        copies or duplicates thereof;

B.      ordering Barbera to return the University C License, and any information obtained
        from that license, to Nanobeak;

C.      ordering Barbera to restore access to the Domain and the Nanobeak Hosting
        Accounts to Nanobeak;

D.      against Barbera awarding compensatory damages in favor of Nanobeak as a result
        of Barbera's conversion, multiple breaches of fiduciary duties, and fraud, in an
        amount to be proven at trial, but in no event less than $5,204,572.82, plus interest
        thereon;

E.      against Barbera awarding punitive and exemplary damages in an amount to be
        determined at trial;

F.      entering a temporary, preliminary, and permanent injunction against Barbera
        barring him from accessing the Nanobeak Systems or using the Confidential
        Information stored thereon;

G.      entering a temporary, preliminary, and permanent injunction against Barbera
        barring him from exploiting the Confidential Information or disseminating it to
        third parties;

H.      granting equitable relief against Barbera in the form of the imposition of a
        constructive trust, accounting and a disgorgement of profits and other benefits
        received by reason of his unlawful conduct;

I.      awarding Nanobeak its attorneys' fees and costs for this Action, as well as for the
        investigation of Barbera's misconduct; and

J.      granting Nanobeak such other and further relief as the Court deems just, proper
        and equitable.

### JURY TRIAL DEMAND

Pursuant to CPLR § 4102, plaintiff Nanobeak hereby demands a trial by jury on all issues

so triable contained in the Complaint.

Dated:     New York, New York
           April 20, 2021

DECHERT LLP

By: _____
       Paul Curran Kingsbery

Michael J. Gilbert
Paul Curran Kingsbery
1095 Avenue of the Americas
New York, New York 10036
michael.gilbert@dechert.com
paul.kingsbery@dechet.com
+1 212 698 3500

*Attorneys for Plaintiff Nanobeak Biotech Inc.*

# Exhibit C

Docket No. 2 in
D&O Action



## REQUEST FOR JUDICIAL INTERVENTION

UCS-840
(rev. 07/29/2019)

**SUPREME** ▼ COURT, COUNTY OF **NEW YORK**

Index No: _____ Date Index Issued: 04/20/2021

| For Court Use Only: |
| --- |
| IAS Entry Date |
| |
| Judge Assigned |
| |
| RJI Filed Date |

**CAPTION** Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

NANOBEAK BIOTECH INC.

Plaintiff(s)/Petitioner(s)

-against-

JAMES JEREMY BARBERA

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING** Check only one box and specify where indicated.

**COMMERCIAL**
- O Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- O Contract
- O Insurance (where insurance company is a party, except arbitration)
- O UCC (includes sales and negotiable instruments)
- ◉ Other Commercial (specify): Breach of Fiduciary Duty and Fraud

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)**.*

**REAL PROPERTY** Specify how many properties the application includes: _____
- O Condemnation
- O Mortgage Foreclosure (specify): O Residential O Commercial
  Property Address: _____
  *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the **FORECLOSURE RJI ADDENDUM (UCS-840F)**.*
- O Tax Certiorari
- O Tax Foreclosure
- O Other Real Property (specify): _____

**OTHER MATTERS**
- O Certificate of Incorporation/Dissolution [see *NOTE* in **COMMERCIAL** section]
- O Emergency Medical Treatment
- O Habeas Corpus
- O Local Court Appeal
- O Mechanic's Lien
- O Name Change
- O Pistol Permit Revocation Hearing
- O Sale or Finance of Religious/Not-for-Profit Property
- O Other (specify): _____

**MATRIMONIAL**
- O Contested
  *NOTE: If there are children under the age of 18, complete and attach the **MATRIMONIAL RJI ADDENDUM (UCS-840M)**.*
  *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (**UD-13**).*

**TORTS**
- O Asbestos
- O Child Victims Act
- O Environmental (specify): _____
- O Medical, Dental or Podiatric Malpractice
- O Motor Vehicle
- O Products Liability (specify): _____
- O Other Negligence (specify): _____
- O Other Professional Malpractice (specify): _____
- O Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- O CPLR Article 75 (Arbitration) [see *NOTE* in **COMMERCIAL** section]
- O CPLR Article 78 (Body or Officer)
- O Election Law
- O Extreme Risk Protection Order
- O MHL Article 9.60 (Kendra's Law)
- O MHL Article 10 (Sex Offender Confinement-Initial)
- O MHL Article 10 (Sex Offender Confinement-Review)
- O MHL Article 81 (Guardianship)
- O Other Mental Hygiene (specify): _____
- O Other Special Proceeding (specify): _____

**STATUS OF ACTION OR PROCEEDING** Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
| --- | --- | --- | --- |
| Has a summons and complaint or summons with notice been filed? | ◉ | O | If yes, date filed: 04/20/2021 |
| Has a summons and complaint or summons with notice been served? | O | ◉ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | O | ◉ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION** Check one box only and enter additional information where indicated.

- O Infant's Compromise
- O Extreme Risk Protection Order Application
- O Note of Issue/Certificate of Readiness
- O Notice of Medical, Dental or Podiatric Malpractice   Date Issue Joined: _____
- O Notice of Motion   Relief Requested: _____   Return Date: _____
- O Notice of Petition   Relief Requested: _____   Return Date: _____
- O Order to Show Cause   Relief Requested: _____   Return Date: _____
- O Other Ex Parte Application   Relief Requested: _____
- O Poor Person Application
- ◉ Request for Preliminary Conference
- O Residential Mortgage Foreclosure Settlement Conference
- O Writ of Habeas Corpus
- O Other (specify): _____

**RELATED CASES**    List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PARTIES**    For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Un-Rep | Parties — List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants — For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined — For each defendant, indicate if issue has been joined. | Insurance Carriers — For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: Nanobeak Biotech Inc. Role(s): Plaintiff | Michael J. Gilbert and Paul C. Kingsbery, Dechert LLP, 1095 Avenue of the Americas, New York, NY 10036, +1 212 698 3500, michael.gilbert@dechert.com, paul.kingsbery@dechert.com | ○ YES ○ NO | |
| ☐ | Name: James Jeremy Barbera Role(s): Defendant | Adam D. Cole, Chipman Brown Cicero & Cole, LLP, 501 Fifth Avenue, 15th Floor, New York, NY 10017, +1 646 685 8363, cole@chipmanbrown.com | ○ YES ◉ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: _____04/20/2021_____

_____
Signature

4978326
Attorney Registration Number

Paul C. Kingsbery
Print Name

# Exhibit D

Docket No. 3 in
D&O Action

Print Form

**SUPREME COURT OF THE STATE OF NEW YORK**

UCS-840C
3/2011

COUNTY OF New York

_____ x

NANOBEAK BIOTECH INC.

Plaintiff(s)/Petitioner(s)

-against-

JAMES JEREMY BARBERA

_____
Defendant(s)/Respondent(s) x

Index No. _____

RJI No. (if any) _____

**COMMERCIAL DIVISION**

**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

[X] Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

[ ] Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

[ ] Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

[ ] Shareholder derivative actions — without consideration of the monetary threshold

[ ] Commercial class actions — without consideration of the monetary threshold

[ ] Business transactions involving or arising out of dealings with commercial banks and other financial institutions

[ ] Internal affairs of business organizations

[ ] Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

[ ] Environmental insurance coverage

[ ] Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

[ ] Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

[ ] Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ 5,204,572.82 or more, with the amount to be proven at trial.

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

Nanobeak requests that the Court enter orders: (i) directing Defendant to return Nanobeak's complete and accurate books and records, computer systems, and all confidential and proprietary information; (ii) directing Defendant to restore Nanobeak's access to its domain name and webpage and email hosting accounts; (iii) enjoining Defendant from accessing, using, or commercially exploiting Nanobeak's proprietary information or computer systems; and (iv) imposing a constructive trust, accounting, and disgorgment of profits and other benefits from his unlawful conduct.

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: 4/20/2021

_____
SIGNATURE

Paul C. Kingsbery
**PRINT OR TYPE NAME**

1 of 1

# Exhibit E

Docket No. 4 in

D&O Action

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

NANOBEAK BIOTECH INC.

**AFFIDAVIT OF SERVICE**
Index No: 652646/2021

          Plaintiff,

   -against-

JAMES JEREMY BARBERA

          Defendant.

-------------------------------------------------------------------X

STATE OF NEW YORK  )
                ) ss.:
COUNTY OF QUEENS  )

    Andrew Bartley, being duly sworn, deposes and says that Deponent is not a party to this action, is over 18 years of age and is a resident of the State of New York.

    On April 21, 2021, at approximately 8:48 p.m., at 104 W. 70th Street, New York, NY 10023, which upon information and belief is the dwelling place or usual place of abode of James Jeremy Barbera, Deponent served the within Summons; Complaint; Request For Judicial Intervention; Commercial Division Request for Judicial Intervention Addendum and Notice of Electronic Filing upon: **James Jeremy Barbera**, by personally delivering to and leaving with "Carlos", the Doorman on duty, a true and correct copy of said documents.

    At the time of service, "Carlos", the Doorman on duty, contacted James Jeremy Barbera via the doorman;'s telephone and announced Deponent. Deponent then spoke with James Jeremy Barbera and informed him that Deponent had the aforementioned documents to serve on him. James Jeremy Barbera instructed Deponent to leave the documents with "Carlos", the Doorman on duty and then instructed "Carlos" to accept service of said documents. "Carlos" acknowledged said service by endorsing a copy of the aforementioned Summons. Said acknowledgment is attached hereto.

    "Carlos", the Doorman on duty, is described as a Hispanic male, approximately 55-60 years of age, 160-170 lbs., 5'-5"2", was bald and wore a doorman's uniform.

    Deponent further states that on April 22, 2021, Deponent served a copy of the aforementioned documents upon James Jeremy Barbera, by depositing a true and correct copy thereof, enclosed in a securely sealed, fully postpaid, First Class mail envelope in an official depository under the exclusive care and custody of the U.S. Postal Service within the State of New York, addressed as follows:

        James Jeremy Barbera
        104 W. 70th Street,
        Apt. 11B New York, New York 10023

    The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerns an action against or involving the addressee. Proof of said mailing is attached hereto.

                                        _____
                                              Andrew Bartley

Sworn to before me this
22nd day of April 2021

_____
    Notary Public

Karlene S. Jackson, Notary Public
State of New York, #01JA5083169
Qualified in Queens County
Commission Expires November 17, 2021



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF New York

| | |
|---|---|
| NANOBEAK BIOTECH INC., Plaintiff(s), -against- JAMES JEREMY BARBERA, Defendant(s). | Index No. 652646/2021<br>**Summons**<br>Date Index No. Purchased: April 20, 2021 |

To the above named Defendant(s)

James Jeremy Barbera
104 West 70th Street, Apt. 11B
New York, NY 10023

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is the residence of Defendant James Jeremy Barbera which is 104 West 70th Street, Apt. 11B, in New York, New York 10023.

Dated: New York, New York
April 20, 2021

DECHERT LLP
by
Paul Curran Kingsbery
Attorneys for Plaintiff
Nanobeak Biotech Inc.

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
+1 212 641 5663
paul.kingsbery@dechert.com

# Exhibit F
Docket No. 5 in
D&O Action

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------x

NANOBEAK BIOTECH INC.,

                    Plaintiff,

       – against –

JAMES JEREMY BARBERA,

                 Defendant.

-------------------------------------------------------x

Index No. 652646/2021

**STIPULATION**

    **IT IS HEREBY STIPULATED AND AGREED** by and between the undersigned counsel for the parties in the above-captioned action that the time for the Defendant to respond to the Complaint is hereby extended to and including June 4, 2021.

Dated: May 26, 2021

CHIPMAN BROWN CICERO & COLE, LLP

By: _____
         Adam D. Cole
501 Fifth Avenue, 15th Floor
New York, New York  10017
Phone:  (646) 685-8363
Email:  cole@chipmanbrown.com

DECHERT LLP

By: _____
    Michael J. Gilbert
    Paul Curran Kingsbery
1095 Avenue of the Americas
New York, New York 10036
Phone: (212) 698-3500
Email:  michael.gilbert@dechert.com
        paul.kingsbery@dechet.com

# Exhibit G

Docket No. 6 in

D&O Action

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------x

NANOBEAK BIOTECH INC.,                          :
                                                :           Index No. 652646/2021
                            Plaintiff,          :
                                                :           Motion Seq. No. 1
            – against –                         :
                                                :           **NOTICE OF MOTION TO**
                                                :           **STAY OR TO DISMISS**
JAMES JEREMY BARBERA,                           :
                                                :           **Oral Argument Requested**
                            Defendant.          :
-----------------------------------------------------x

PLEASE TAKE NOTICE that upon the Affirmation of Adam D. Cole, Esq. dated June 4,

2021, with exhibits, upon *Defendant's Memorandum of Law in Support of Motion to Stay or*

*Dismiss*, dated June 4, 2021, and upon all the papers and proceedings heretofore had herein,

Defendant, James Jeremy Barbera, will move this Court, at the Courthouse located at 60 Centre

Street, Room 130, New York, New York on the 22nd day of June, 2021, at 9:30 o'clock in the

forenoon of that date, or as soon thereafter as counsel can be heard, for an Order, (i) pursuant to

CPLR § 2201 to stay this action pending resolution of a parallel criminal proceeding, or (ii)

pursuant to CPLR 3211(a)(7) to dismiss Counts II and III of the Complaint.

PLEASE TAKE FURTHER NOTICE that, pursuant to CPLR 2214, all answering papers

shall be served on the undersigned on or before June 14, 2021.

Dated:  New York, New York
        June 4, 2021                    CHIPMAN BROWN CICERO & COLE, LLP


                                        By:_____
                                            Adam D. Cole
                                            501 Fifth Avenue, 15th Floor
                                            New York, New York  10017
                                            Phone:  (646) 685-8363
                                            Email:  cole@chipmanbrown.com


                                        *Attorneys for Defendant James Jeremy Barbera*

To:

Michael J. Gilbert, Esq.
Paul Curran Kingsbery, Esq.
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
michael.gilbert@dechert.com
paul.kingsbery@dechert.com

*Attorneys for Plaintiff Nanobeak Biotech Inc.*

2

# Exhibit H
Docket No. 7 in
D&O Action

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------x

NANOBEAK BIOTECH INC.,          :

                                      :

                   Plaintiff,    :

                                        :      Index No. 652646/2021

       – against –        :

                                        :

JAMES JEREMY BARBERA,       :

                                        :

                   Defendant.   :

-------------------------------------------------------x

## AFFIRMATION OF ADAM D. COLE, ESQ.
## IN SUPPORT OF MOTION TO STAY OR TO DISMISS

      ADAM D. COLE, an attorney duly admitted to practice before the Courts of the State of

New York, hereby affirms under penalty of perjury the following:

      1.     I am a partner with the firm Chipman Brown Cicero & Cole, LLP, attorneys for

Defendant, James Jeremy Barbera ("Barbera"). I am fully familiar with the facts set forth herein

based upon my direct participation in this and related actions, and a review of the litigation file

maintained by my firm and the public record.

      2.     I respectfully submit this Affirmation in support of Barbera's motion, pursuant to

CPLR § 2201 and CPLR 3211(a)(7) to stay this action filed by Plaintiff, Nanobeak Biotech Inc.

("Nanobeak"), pending resolution of a parallel criminal proceeding against Barbera or,

alternatively, to dismiss Counts II and III of the Complaint in this action. A copy of the Complaint,

filed April 20, 2021, is attached as Exhibit "A".

      3.     On December 9, 2020, the Criminal Action was filed accusing Barbera of criminal

conspiracy, securities and wire fraud violations relating to Nanobeak. A copy of the Criminal

Complaint, filed December 9, 2020, is attached as Exhibit "B".

4.      On March 8, 2021, an Indictment was unsealed, charging Barbera with the crimes alleged in the Criminal Complaint.  A copy of the Indictment is attached as Exhibit "C".

5.      Should Barbera be forced to proceed with this action while the parallel Criminal Action remains pending, he will have no other choice but to, and he will, invoke his Fifth Amendment right against self-incrimination in this action.

WHEREFORE, for the reasons set forth herein, and in the accompanying memorandum of law, the Court should grant Barbera's motion, pursuant to CPLR § 2201 to stay this action pending resolution of a parallel criminal proceeding against Barbera or, alternatively, to dismiss pursuant to CPLR 3211(a)(7) Counts II and III of the Complaint in this action.

Dated:  New York, New York
        June 4, 2021

_____
        ADAM D. COLE

# Exhibit I

Docket No. 8 in
D&O Action

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF  New York

---

NANOBEAK BIOTECH INC.,

Plaintiff(s),

-against-

JAMES JEREMY BARBERA,

Defendant(s).

---

Index No.

## Summons

Date Index No. Purchased:  April 20, 2021

To the above named Defendant(s)

James Jeremy Barbera
104 West 70th Street, Apt. 11B
New York, NY 10023

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is  the residence of Defendant James Jeremy Barbera which is  104 West 70th Street, Apt. 11B, in New York, New York 10023.

Dated:  New York, New York

April 20, 2021

DECHERT LLP

by _____
Paul Curran Kingsbery

Attorneys for Plaintiff
Nanobeak Biotech Inc.

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
+1 212 641 5663
paul.kingsbery@dechert.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------- :
                                  :

NANOBEAK BIOTECH INC.,              :

                                   :         Index No. _____

                      *Plaintiff,*   :

                                   :

      – against –                    :

                                   :         **COMPLAINT**

JAMES JEREMY BARBERA,         :

                                   :       **JURY TRIAL DEMANDED**

                         *Defendant.*   :

                                   :
--------------------------------------------------------- :

      Plaintiff Nanobeak Biotech Inc. ("Nanobeak" or the "Corporation"), for its Complaint against Defendant James Jeremy Barbera ("Barbera") states as follows:

## NATURE OF THE CLAIMS

      1.     Nanobeak is a privately held corporation that develops technologies focused on the detection of early-stage lung cancer. From August 2009 until his resignation under pressure from the Nanobeak's board of directors and stockholders in October 2019, Barbera was Nanobeak's Chief Executive Officer.  Following his resignation as CEO, Barbera served as Nanobeak's Chief Science Officer ("CSO") until his suspension in December 2019 and ultimately his removal from that position by the Board on April 3, 2020. Barbera also served as a member of Nanobeak's board of directors (the "Board") from August 2009 until March 2020, when Nanobeak's stockholders removed him from the Board.

      2.     Through this action, Nanobeak seeks redress for Barbera's theft of the Corporation's assets, his gross dereliction of his fiduciary duties as an officer and director of the Corporation, his diversion of Nanobeak investor funds to his own personal bank accounts, and

his unlawful refusal to return Nanobeak's computer systems and its books and records. Nanobeak further seeks a full accounting of Barbera's handling of its corporate assets.

3.     A forensic accounting review commissioned by the Corporation after Barbera resigned as the CEO determined that, from 2014 through 2019, Nanobeak received a total of $14,316,451.86—from debt and equity investments and transfers from a subsidiary. At the time of Barbera's resignation, the Corporation's bank account had a balance of $13,979.77. In the 2014 through 2019 time period, the forensic accounting review could only confirm $4,706,907.07 in apparently legitimate business expenditures.

4.     Barbera treated Nanobeak as his own personal "piggy bank." While Barbera has not permitted the Corporation to access many records from 2009 to 2013, the records to which the Corporation does have access establish that, from 2014 through 2019, Barbera converted $4,264,325.31 of Nanobeak's funds for his own personal expenses (the "Personal Expenses") without the knowledge or approval of the Board. The Personal Expenses comprise a total of more than 7,800 transactions and included expenditures for the mortgage on a home Barbera owns with his ex-wife and for his luxury apartment, cash withdrawals, transfers to Barbera's family members and ex-wife, tuition for his children, and payments for Barbera's personal automobile and automobiles for others. During the same time period, Barbera converted an additional $131,707.23 of Nanobeak's funds to pay legal and other expenses related to his incorporation of other entities that had no connection to Nanobeak's business (the "Personal Legal Expenses"). Additionally, between November 2018 and February 2019, Barbera made a series of international wire transfers that totaled $128,500 to a person located in the Ukraine through Privatbank Ukraine (the "Ukraine Transfers") that appears to have served no legitimate Nanobeak business purpose.

– 2 –

5.      Barbera perpetuated his fraud by providing false financial statements to the Board that falsely inflated Nanobeak's reported legitimate business expenses to conceal that he was taking money out of the Corporation for his personal use.

6.      Barbera also mismanaged the affairs of the Corporation and engaged in acts of clear corporate waste—in violation of his fiduciary duty of care—throughout his tenure as CEO. Between 2016 and 2019, Barbera, purportedly on behalf of the Corporation, entered into a series of wasteful "merchant advance" agreements that, while superficially characterized as advances against Nanobeak's expected receivables, functioned as loans at exorbitant interest rates because Nanobeak had no receivables during that time period. The apparent purpose of these agreements was to perpetuate Barbera's conversion of Nanobeak's assets, not to raise funds for legitimate business activities. Based on information currently known to the Corporation, these merchant advance agreements caused it to make wasteful expenditures of at least $680,040.28 (the "Merchant Advance Losses").

7.      While a large portion of the $9,609,544.79 of expenditures without any clear business justification were for the Personal Expenses, the Personal Legal Expenses, the Ukraine Transfers, and the Merchant Advance Losses, Nanobeak lacks sufficient information to determine whether the remaining $4,404,971.97 (the "Unknown Expenses") was spent on legitimate business expenses because Barbera has refused to provide the Corporation with access to its full and complete books and records (the "Books and Records").

8.      In addition to his outright theft from the Corporation, Barbera was completely ineffective at managing Nanobeak's business. As explained in further detail below, Barbera's conduct contributed to protracted delays in a study that Nanobeak had commissioned with a major research university. Facing intense pressure from the Board and Nanobeak stockholders

– 3 –

due to the Corporation's deteriorating financial condition and his inability to accomplish the
Corporation's development objectives, Barbera resigned as Nanobeak's Chief Executive Officer
in October 2019.

9.      Following Barbera's resignation, the Board appointed a new interim CEO, who
began an informal review of Barbera's management of Nanobeak and requested that Barbera
return all Nanobeak corporate records. Barbera refused to return the Books and Records, and in
December 2019, the Board suspended Barbera from his position as CSO and engaged a law firm
and forensic accounting firm to review the corporate records then available. After this review
determined that Barbera had engaged in serious misconduct, Nanobeak severed all ties with
Barbera in April 2020. Throughout the forensic accounting review and following his termination,
the Corporation requested that Barbera return, in addition to the Books and Records, all other
corporate property in his possession—including certain confidential information of high value to
the Corporation. Barbera continues to refuse to provide the Books and Records or to return
Nanobeak's confidential information or computer systems.

10.     By holding the Books and Records and other property of the Corporation hostage,
Barbera has breached his fiduciary duties to the Corporation as an officer and director.

11.     Nanobeak has also discovered evidence that, while CEO, Barbera diverted
investor funds to accounts in the name of two entities that he created with names confusingly
similar to Nanobeak. Based on information currently available to the Corporation, it is not clear
whether Barbera ultimately used these other entities to convert funds meant to be invested in
Nanobeak to his own use.

12.     The purpose of this action is to recover damages for Barbera's conversion of
assets and breaches of fiduciary duties, as well as all corporate property that Barbera stole from

– 4 –

Nanobeak or has wrongfully retained, including corporate records necessary to determine the full extent of harm caused by Barbera's misconduct.

## PARTIES

13.     Plaintiff Nanobeak is a closely held corporation organized under the laws of Delaware with its principal place of business in New York. Nanobeak was originally formed as a California corporation in 2009, but was converted into a Delaware limited liability company in 2014, and later into a Delaware corporation under the name "Nanobeak, Inc." in 2015. In July 2019, the Corporation's name was changed to "Nanobeak Biotech Inc."—its current legal name.

14.     Defendant Jeremy Barbera is a natural person who, on information and belief, is a citizen of the State of New York and has resided in New York, New York at all times relevant to this Complaint. Barbera was the incorporator of Nanobeak and served as a director and its CEO from 2009 through October 2, 2019. Following Barbera's resignation as CEO, he continued to serve as a director and the Corporation's CSO until his removal from those positions in March 2020 and April 2020, respectively. Barbera was removed as a director of Nanobeak by a written stockholder consent on March 25, 2020, and from his position as CSO by the Board through a resolution dated April 3, 2020.

## JURISDICTION AND VENUE

15.     This Court has personal jurisdiction over Barbera pursuant to CPLR § 301. Defendant resides and conducts business in New York County and committed tortious acts in New York County.

16.     Venue is proper in New York County pursuant to CPLR § 503(a) because Defendant Barbera resides in New York County.

– 5 –

## BACKGROUND

### I.     Nanobeak's Founding and Early Corporate History

17.     In 1987, Barbera became the Chief Executive Officer of Metro Services Group, Inc., a corporation that developed information-based services used in direct marketing and fundraising campaigns. In October 1996, Metro Services Group, Inc. was acquired by All-Comm Media Corporation, a corporation that provided database management services, custom telemarketing services and other direct marketing services to U.S. customers. Barbera thereafter served as a director and Vice President of All-Comm while continuing to serve as the CEO of Metro. In 1997, All-Comm's name was changed to "Marketing Services Group, Inc.," and Barbera became its CEO. Eventually, Marketing Services Group, Inc. was renamed "MSGI Technology Solutions, Inc." ("MSGI").

18.     MSGI's stock was publicly traded on the OTC Bulletin Board.

19.     In October 2009, the National Aeronautics and Space Administration ("NASA") announced a partnership with MSGI, then operating under the name "MSGI Security Solutions, Inc.," to develop solar cell technology and technologies to detect gas and organic vapors found in human breath.

20.     In August 2009, Barbera formed Nanobeak, Inc. as a California corporation. He caused MSGI to describe Nanobeak as a "subsidiary" in MSGI's public filings with the SEC, but, records obtained from the California Secretary of State indicate that Nanobeak was owned entirely by Barbera at the time of its formation. As stated in MSGI's SEC filings, the purpose of Nanobeak was to develop, and eventually market, gas and organic vapor-detection technology licensed from NASA. Specifically, MSGI announced that Nanobeak was working to develop a handheld screening test for diabetes that functioned by measuring the acetone levels of subjects' breaths, with the intent of replacing blood tests. That product was never developed.

– 6 –

21.     On June 7, 2011, the SEC issued an order temporarily suspending trading in MSGI's securities due to questions about the adequacy and accuracy of publicly available information about MSGI and other "microcap" stocks.

22.     In July 2014, the SEC filed an action in this Court against MSGI and Barbera, alleging that, starting in around 2008, MSGI's business had declined, but Barbera concealed the true state of MSGI's financial condition from its investors. The SEC alleged that, while Barbera had "portray[ed] MSGI as a rapidly growing and hugely promising technology venture, MSGI remains essentially dormant with little or no capital." The SEC charged Barbera with engaging in a "fraud that materially misled investors about the true business operations and finances of MSGI." Barbera settled those charges with the SEC. He neither admitted to nor denied the SEC's charges, but agreed to pay a $100,000 penalty and to a bar on serving as an officer or director of a public company or participating in any future "penny stock" offerings.

23.     In August 2014—less than three days after the settled charges relating to MSGI were announced—Nanobeak, which had originally been formed as a California corporation, was merged into a newly created Delaware limited liability company, Nanobeak LLC.

24.     In November 2015, Nanobeak was converted into a Delaware corporation, and its name was changed to Nanobeak Biotech, Inc. in July 2019.

25.     The SEC revoked the Exchange Act registration of MSGI on December 18, 2015.

**II.     Nanobeak's Efforts to Develop Breath Analysis Technologies**

26.     From Nanobeak's formation in August 2009 until Barbera's resignation in October 2019, Barbera was Nanobeak's CEO. At all times relevant to this complaint, Barbera managed the Corporation out of its principal office in New York, New York and had sole control over Nanobeak's bank accounts.

– 7 –

27.     During his tenure as CEO, Barbera's mismanagement contributed to sustained delays in the development of the breath analysis technologies and effectively prevented Nanobeak from bringing its planned screening product to market.

28.     In December 2013, Nanobeak completed a partially exclusive master licensing agreement with NASA granting Nanobeak a license to patents numbered US 7426848 B1, US 76233972 B1, US 7801687 B1, and US 8000903 B1. This license agreement is and remains valuable to Nanobeak because it permits the corporation to use and develop, among other things, breath analysis screening technologies. In December 2015, NASA and Nanobeak agreed to extend the term of this licensing agreement to December 31, 2021.

29.     Under the license agreement with NASA, Nanobeak agreed to certain "milestones" for the development of breath screening products. These milestones included conducting clinical trials for the detection of cancer in a hospital setting by the first quarter of 2015 and the formalization of sales and marketing channels for screening products by the fourth quarter of 2015. Nanobeak did not achieve these milestones on the schedule contemplated in the original license agreement. The December 2015 extension of the license agreement provided for modified development milestones. The clinical trial milestone was extended to 2017 and the formalization of sales and marketing channels milestone was extended to 2020. None of these milestones were met.

30.     Starting in October 2016, Nanobeak entered into a series of agreements with a nationally recognized research university ("University A") to research the use of volatile organic compounds ("VOCs") to detect lung cancer and then to sponsor a clinical trial as contemplated in the NASA license agreement. In exchange for payments from Nanobeak, a division of University A ("Division A") agreed to conduct a research program to design the experiment and

– 8 –

analyze the data (the "Confirmation Study"). Later, another division of University A ("Division

B") agreed to conduct an additional study (the "Development Study") comparing the VOC levels

in lung cancer patients with those of healthy individuals and to perform statistical analyses. The

purposes of these studies were to confirm the ability of certain VOC "signatures" to diagnose

Stage 1 lung cancer and to develop new VOC signatures. Information about these signatures was

valuable to Nanobeak because it could be used in combination with the NASA-licensed

technology to develop early stage lung cancer screening technologies.

31.     The agreement between Nanobeak and Division A of University A contemplated

that University A's "performance period" for the Confirmation Study would run from November

1, 2016, to October 31, 2017. The initial agreement set forth the projected cost of the

Confirmation Study, which was later increased in an amended agreement dated December 26,

2016, and payment terms. Due largely to Barbera's mismanagement, Nanobeak failed to comply

with the payment terms of the agreement, but Nanobeak and University A agreed to modified

payment terms on November 7, 2017. The agreement was amended for a third time on March 19,

2018, to provide for the purchase of special equipment for the study. Nanobeak made the

required payments for this equipment six months later than planned, delaying the progress of the

trial. At Barbera's direction, Nanobeak continued to violate the payment terms of the amended

agreement, and Nanobeak and University A entered into a fourth amendment on October 29,

2018, which provided a new payment schedule. A new payment schedule was provided, but

Barbera again caused Nanobeak to make payments late or failed to make payments at all.

32.     The agreement between Nanobeak and Division B of University A contemplated

that performance of the Development Study would run from June 1, 2017 to May 31, 2018.

However, as with the Division A agreement, Barbera caused delays by failing to comply with the

payment terms of this agreement. Barbera also violated University A's ethics rules by entering

into a consulting agreement with a University A employee and naming the head of the clinical

trial to Nanobeak's advisory board. As a result of the payment delays and Barbera's unethical

conduct, the project was not ultimately completed until May 2020.

33.     A substantial cause of the payment delays in connection with the University A

agreements was Barbera's theft from Nanobeak. For example, the Corporation owed University

A $147,000 in August of 2019 that Barbera never caused Nanobeak to pay, however during the

10 months preceding and the two months following that date, Barbera caused Nanobeak to pay

personal expenses to him in excess of $925,000. The $147,000 represented only 16% of what he

paid himself. On information and belief, had he directed Nanobeak funds be used to pay

University A instead of diverting money for his personal expenses, the research could have been

completed sooner.

34.     Primarily as a result of the payment delays, University A was not able to complete

its clinical trials until December 2019 and not able to complete its signature development until

May 2020. However, as noted above, an additional cause for the delay was Barbera's

inexplicable and unethical hiring of a University A employee in January 2019. In violation of

University A's ethical rules governing relationships between the university's employees and

clinical trial sponsors, Barbera paid this employee over $10,000 for "consulting services." When

University A discovered the arrangement in July 2019, University A directed the employee to

sever ties with Nanobeak, but Barbera's ethical lapse contributed to a months-long delay in the

finalization of University A's studies.

35.     When Nanobeak finally received the results from University A in May 2020, they

were no longer as valuable as they would have been if they had been received on the originally

contemplated schedule because, among other reasons, Nanobeak lost time that could have been
spent on product development.

36.     Starting in April 2019, Barbera began discussions with another research
university ("University B"), purportedly to complete the study that University A had started but
not yet completed at the time. On information and belief, this was an attempt by Barbera to cover
for his mismanagement of the relationship with University A, which had contributed to
substantial delays in University A's progress. On October 18, 2019—after he had already
resigned as Chairman and CEO of Nanobeak—Barbera purported to execute an agreement with
University B to, in effect, continue the work that University A had started. This contract with
University B was not known or approved by the Board, but Barbera held himself out as an
authorized officer of Nanobeak, despite his prior resignation as Nanobeak's CEO. In addition,
Barbera provided University B with confidential information from University A, including the
signed University A agreements, the sampling protocol, budgets, and documents relating to the
approval of the study by University A's Institutional Review Board. This was done without the
knowledge of the Board.

37.     University B did not end up conducting the study, but in the process of planning
for and seeking approval for the contemplated study, University B incurred expenses for which
Nanobeak was required to reimburse University B.

38.     In or around May 2019, while Barbera was still serving as Nanobeak's CEO and a
member of the Corporation's board of directors, he also caused Nanobeak to license information
from a research university in Italy ("University C") that could be used to develop a VOC
signature for colorectal cancer (the "University C License"). Although he informed the Board
and certain Nanobeak investors about the acquisition of this license, Barbera has refused to

provide Nanobeak with the information provided by the University C License or any documents evidencing the license. However, because Barbera purchased this license in the course of his duties as an officer of Nanobeak, the University C License is property of the Corporation, not Barbera's personal property. His refusal to provide the University C License to Nanobeak constitutes unlawful conversion, mismanagement of the Corporation's assets, and a violation of his fiduciary duties of care and loyalty.

### III. Barbera's Scheme to Defraud Nanobeak and to Convert and Misuse Nanobeak Property

39.     From 2014 and continuing through to his resignation as CEO, Barbera plundered Nanobeak's bank accounts. He used Nanobeak's money to pay his personal expenses the day before his resignation, the day of his resignation and continued until the bank account was overdrawn. As Barbera knew that he was taking the Corporation's assets without any legal entitlement to the same, this course of conduct constituted unlawful conversion, as well as a gross breach of his fiduciary duties of care and loyalty. Barbera knew that taking millions of dollars from the Corporation would threaten the Corporation's ability to develop technology and market diagnostic products, but placed his own personal interests above the Corporation's and its shareholders' interests.

### A.     Barbera's Conversion of Nanobeak Funds

40.     Between January 1, 2014 and October 2, 2019, Nanobeak's main bank account received a total of $14,316,451.86 in cash inflows from all sources, including equity investments, loans, and convertible debt instruments. By the date of his resignation the bank account had $13,979.77 and within three days the balance was -$3,918.48 Nanobeak generated no revenue from its business operations in any year.

– 12 –

41.  Based on information currently known to Nanobeak, only $4,706,907.07—or just 32.8% —of the total inflows for the 2014 through 2019 time period were spent on legitimate business expenses, including for payments due to NASA under the license agreement, payments to University A, and legitimate consulting fees.

42.  Of the remaining $9,609,544.79 received by Nanobeak, Barbera caused Nanobeak to spend $4,264,325.31 on the Personal Expenses, which included, among other things, mortgage payments for Barbera's residence he owns with his ex-wife that is located in New York City ($299,726.59), payments for a luxury apartment in New York City ($659,491.16), cash withdrawals from Nanobeak's bank account ($985,257.51), fund transfers to Barbera's family members and ex-spouse ($771,240.87), payments to schools including tuition for Barbera's children ($159,230.44), jewelry, gifts and entertainment ($206,236.05) and personal automobile expenses ($110,254.40). The Personal Expenses comprised 7,862 separate expenditures between January 1, 2014, and October 2, 2019.

43.  Barbera also caused Nanobeak to spend $131,707.23 for the Personal Legal Expenses. These payments were made for corporate formation expenses and legal fees for businesses unrelated to Nanobeak, except that they were formed and controlled by Barbera, without the knowledge of the board. Specifically, the payments were made from Nanobeak's bank account to the Corporation Service Company and several law firms. Barbera caused the Corporation to expend these funds without any legitimate business purpose for the benefit of Nanobeak. The Personal Legal Expenses comprised 38 separate expenditures between January 1, 2014, and October 2, 2019.

44.  Barbera also converted $128,500 of Nanobeak's assets through the Ukraine Transfers. Between November 2018 and February 2019, Barbera executed a series of five

– 13 –

international wire transfers to an unknown person located in the Ukraine through Privatbank

Ukraine with no known legitimate business purpose for the Corporation. On information and

belief, Nanobeak does not have any known license or consulting agreements with persons or

entities located in Ukraine.  Moreover, the records available indicate that the recipient of the

Ukraine Transfers was an individual named "Julia."  Barbera has introduced a Ukrainian

individual named "Julia" to a Nanobeak stockholder as his girlfriend. Therefore, it appears likely

that the Ukraine Transfers were made to Barbera's girlfriend. In any case, because there is no

apparent business purpose for the Ukraine Transfers, this appears to be yet another act of

conversion by Barbera.

45.     As detailed further below in ¶¶ 65–71, the Personal Expenses, the Personal Legal

Expenses, and the Ukraine Transfers were concealed from the Board and potential investors in

Nanobeak's financial statements during Barbera's time as CEO.

46.     In summary, based on the information currently known to Nanobeak, Barbera

spent a total of approximately $4.5 million of Nanobeak's funds—or approximately 31.6% of the

total cash inflows of the Corporation—on personal expenses without any legitimate business

purpose. Barbera's taking of the Personal Expenses, the Personal Legal Expenses, and the

Ukraine Transfers was unlawful and contrary to the true owner's (Nanobeak's) own possessory

rights in its own property.

### B.     Barbera's Wasteful Merchant Advance Contracts

47.     In addition to Barbera's outright theft and conversion of Nanobeak property, he

also caused it to enter into wasteful borrowing arrangements with merchant advance companies

that imposed punishing interest rates on Nanobeak. While superficially denominated as

"advances" on Nanobeak's "anticipated receivables" from its operations, these agreements

functioned as loans at exorbitant interest rates because, as Barbera knew, Nanobeak had not brought any finished product to market and thus had no receivables from its operations.

48.     Based on the information currently known to Nanobeak, it received a total of $1,068,343.13 from these merchant advance companies, but paid at least $1,748,383.41 in interest and principal payments. Thus, Barbera caused Nanobeak to absorb Merchant Advance Losses of at least $680,040.28.

49.     On information and belief, Barbera entered into additional, unknown loan agreements with merchant advance companies, but as he has refused to provide the full and complete Books and Records, the full impact of Barbera's misconduct is unknown.

50.     Additionally, because the precise details concerning the lending arrangements with the merchant advance companies are contained in Nanobeak's Books and Records, which Barbera has refused to return, it is not possible to determine with precision how much of the $1,748,383.41 was paid in interest as opposed to principal. However, in the course of investigating Barbera after his termination, Nanobeak has obtained copies of the agreements between Nanobeak and two merchant advance companies indicating that the effective interest rate for certain of the agreements exceeded 30% per annum. Accordingly, to the extent certain of the payments Nanobeak has made can be characterized as "interest" rather than "principal" on the agreements, Nanobeak's actual harm from the merchant advance agreements could be substantially larger.

51.     Barbera's decision to enter into those agreements had a substantial negative impact on Nanobeak's financial position. Accordingly, and because those agreements did not serve any legitimate business objective of Nanobeak, they constituted a waste of Nanobeak's assets.

– 15 –

### C.   Barbera's Diversion of Investments in Nanobeak

52.   Barbera also further violated his fiduciary duties of care and loyalty to Nanobeak by diverting amounts intended to be paid into Nanobeak as equity investments to entities he controlled. The precise extent of the harm to Nanobeak as a result of these diversions of investments is currently unknown because Barbera has wrongfully withheld access to the Books and Records.

53.   During his tenure as Nanobeak's Chief Executive Officer, Barbera formed three business entities with names confusingly similar to Nanobeak:

> (i)   Nanobeak Limited, which was formed in May 2014 in the United Kingdom ("Nanobeak UK") and is still active;
>
> (ii)  Nanobeak Fiduciary Group LLC, which was formed in November 2014 in Delaware ("Fiduciary Group") and was cancelled in March 2017; and
>
> (iii) Nanobeak Ukraine Inc., which was formed in October 2018 in Delaware ("Nanobeak Ukraine") and is still active. Nanobeak Ukraine's name was changed to Nanobeak Biotech II Inc. in 2019 and later to Harmonic Convergence Inc. in 2020.

The board of directors of Nanobeak never authorized the formation of these entities, and they were not owned or controlled by Nanobeak. These entities served no legitimate business purpose for Nanobeak.

54.   On three occasions presently known to the Corporation, Barbera directed investments intended for Nanobeak into accounts he created for Nanobeak Ukraine.

55.   Barbera established a bank account for Nanobeak Ukraine in February 2019. The bank account was established at the same bank where Nanobeak maintained its operating account.

56.   In June 2019, a Nanobeak director intending to make a $300,000 equity investment in Nanobeak asked Barbera to provide wire instructions for payment. Barbera sent

wire instructions that identified "Nanobeak Biotech Inc." as the payee, but included the account number for Nanobeak Ukraine, instead of Nanobeak's actual bank account number. When the director entered the information from Barbera's fraudulent wire instructions and executed the transfer, the result was that money intended for Nanobeak was sent into the Nanobeak Ukraine account, and because Barbera's entity had a name very similar to Nanobeak's actual corporate name at the time, the wire transfer cleared despite the minor discrepancy in the names of the two entities.

57.     On this particular occasion in June 2019, Nanobeak did not suffer a monetary loss because the money was later paid into Nanobeak's operating account. But Barbera never disclosed to the director in advance that he was directing funds to a non-Nanobeak account.

58.     Barbera executed a similar diversion of a $300,000 deposit from a Nanobeak investor into the Nanobeak Ukraine bank account in June of 2019. Again, Nanobeak did not sustain direct financial losses from this diverted investment, but Barbera never disclosed that he was diverting the funds to an entity he controlled and provided fraudulent wire transfer instructions.

59.     Barbera executed a similar diversion of a $125,000 deposit from a Nanobeak investor into the Nanobeak Ukraine bank account August 2019. Barbera never disclosed that he was diverting the funds to an entity he controlled and provided fraudulent wire transfer instructions.

60.     Barbera also executed five transactions totaling more than $190,000 between 2015 and 2018 where shareholder money was diverted to his personal checking account. On these particular occasions, Nanobeak did not suffer a monetary loss because the money was later paid into Nanobeak's operating account. But Barbera never disclosed to the shareholders in

advance that he was directing funds to a non-Nanobeak account. He also did not disclose the

transactions to the Board.

61.     During his time as CEO of Nanobeak, Nanobeak Ukraine and Nanobeak Limited

UK paid a total of $1,449,507.33 into Nanobeak's operating account. Based on the information

currently known to Nanobeak, Barbera had a pattern and practice of diverting invested funds into

these entities, which were under his sole control. Because Barbera was a fiduciary of Nanobeak,

to the extent he has failed to pay over the full amounts of the intended investments, Barbera is

liable to Nanobeak for the full amount of the intended investments. Accordingly, Nanobeak is

entitled to an accounting of all investor funds that Barbera routed through these entities.

**D.     Nanobeak's Acquisition of Information Technology Assets**

62.     In furtherance of the Corporation's business, Barbera used Nanobeak funds to

acquire certain information technology assets during his time as CEO.

63.     Nanobeak acquired two valuable domain names: nanobeak.com and

mobilehealthcare.com (the "Nanobeak Domains"). The nanobeak.com domain was purchased by

Barbera, as an incorporator and CEO of Nanobeak, in 2009. MobileHealthCare.com was

purchased from the owner of that URL for $10,000 in 2016 using Nanobeak funds. Both

domains were registered by Barbera within the scope of his duties as an officer of Nanobeak, and

he used Nanobeak funds to pay for the purchase and renewals of those domains. Nonetheless,

since his resignation as CEO, Barbera has refused to cede control of the Nanobeak Domains to

the current officers and directors of Nanobeak, and has claimed them as his personal property.

Likewise, even though Nanobeak's funds were used to fund certain webpage and email hosting

services based on the nanobeak.com domain through Professional Edge, LLC, Barbera has

purported to withhold his consent to transfer the relevant Professional Edge accounts (the

"Nanobeak Hosting Accounts") to Nanobeak's current management. The Nanobeak Domains

– 18 –

and the Nanobeak Hosting Accounts are property of the Corporation, and Barbera's refusal to restore that property upon Nanobeak's lawful request constitutes a breach of his fiduciary duties as well as conversion and theft. These email accounts contain valuable information to Nanobeak including contact information, agreements, obligations and other valuable information.

64.      Between January 2014 and July 2019, Nanobeak funds were used to purchase more than $30,000 in computer and other IT equipment (the "Nanobeak Systems"). These computer systems were, at all times, Nanobeak's property. On information and belief, the Nanobeak Systems contain proprietary and confidential information developed by Barbera during his time as a Nanobeak's CEO such as Books and Records of the Corporation, obligations, contact information, agreements and other valuable information (with the University C License, the "Confidential Information"). Since his December 2019 suspension as an officer of Nanobeak, Barbera has refused to return any of the Nanobeak Systems or even full and accurate copies of the documents maintained on those systems. Instead, he has continued to use those systems and exploit the information for his own personal gain, including by frustrating Nanobeak's investigation of his misconduct.

**IV.      Barbera Conceals His Theft by Fraud During his Tenure as Nanobeak's CEO**

65.      During his tenure as Nanobeak CEO, Barbera was responsible for working with accountants retained by the Corporation to prepare financial statements on behalf of the Corporation. Barbera presented these financial statements to the Board and to potential investors, but they did not accurately reflect Nanobeak's financial position.

66.      For example, the balance sheet Barbera provided to the Board dated December 31, 2018, showed liabilities of $8.4 million, however it appears that Nanobeak's liabilities at the time exceeded $14 million. In addition, Barbera inflated the legitimate business expenses that

were reported in order to cover up his fraud and embezzlement. For example, the December 31, 2018 financial statements showed legal fees of $112,007.99, however the available bank records show that the Corporation paid only $22,500 to its counsel—an overstatement of more than 400%. Barbera also reported falsely inflated amounts paid to two legitimate business partners of the Corporation by $186,219.04 and for office space rental by $100,341.75. He also failed to disclose the Ukraine Transfers that had been made as of December 31, 2018, which amounted to $68,500.

67.     Barbera overstated many legitimate business expenses, but he also grossly understated how much he was getting paid by the Corporation.  While the Corporation's review has shown that Barbera received nearly $800,000 from Nanobeak in 2018, Barbera listed Officer and Director Compensation as just $325,541.89.

68.     The Board relied on the accuracy of those financial statements in their supervision of Barbera's management of Nanobeak, and if those financial statements revealed the truth about Barbera's mishandling and conversion of Nanobeak's funds, the Board would have removed him from his position as CEO. Accordingly, but for Barbera's fraudulent statements and omissions in the Corporation's financial statements, he would not have been able to continue his scheme to steal from Nanobeak.

69.     As Barbera knew, the financial statements he presented to the Board did not accurately present Nanobeak's financial position or activities. Based on the records currently available to Nanobeak, the financial statements presented to the Board are contradicted by bank account records.

70.     Other financial statements were presented to potential investors showing that Barbera had received a total of just $1,268,000 in compensation between January 1, 2014 and

December 31, 2018. But as described above, Barbera took a minimum of $4.2 million in compensation in 2014 through 2019.

71.     While Barbera may not have prepared the financial statements himself, he did hire and pay the CFO whom he has worked with before at MSGI for many years. In addition, Barbera was responsible for providing the CFO with the original documents and agreements for the CFO to use in preparing the financial statements. Thus, Barbera either did not provide the CFO with important documents showing the true financial state of the Corporation or the CFO was told to ignore them. In either case, the financial statements were fraudulent and Barbera presented those financial statements to the members of the Board and potential investors in an effort to conceal his misconduct, knowing that if he had disclosed that he was stealing millions of dollars from the Corporation, the Board would have immediately suspended or terminated him.

**V.     Barbera's Unlawful Retention of the Books and Records, the Nanobeak Systems and the Confidential Information**

72.     Following Barbera's suspension as CSO in December 2019, the Corporation conducted a forensic accounting review of Barbera's management of Nanobeak based on the limited available banking and financial records, communications with Nanobeak stockholders, and publicly available information. As outlined above, this review has uncovered facts showing that Barbera engaged in serious misconduct while serving as the CEO of Nanobeak.

73.     However, since his resignation, Barbera has consistently refused to return the Books and Records, all of which were in his exclusive possession, custody, and control. Barbera has also refused Nanobeak's request for the return of the Nanobeak Systems and the Confidential Information.

74.     When the Corporation first requested the return of the Books and Records and the Confidential Information, Barbera claimed that he could not return the Nanobeak Systems or the

– 21 –

Books and Records to the Corporation because the computer system he was using had experienced a "hard drive" crash. This explanation was not offered in good faith, because if Barbera actually did experience a "hard drive crash" on his systems, he could have provided any drives from those systems to the Corporation for restoration by a professional data recovery service. Instead, Barbera refused to cooperate with any of Nanobeak's efforts to secure the return of its own rightful property.

75.     In fact, Barbera has a history of claiming that important data has been lost as a result of "computer crashes." For example, in April 2015, November 2017, and May 2018, Barbera told other Nanobeak personnel that he was unable to provide data for their use because he had experienced a "crash" of his IT systems in various respects.

76.     Furthermore, while still an officer and director, Barbera has formed, or worked with an existing shareholder and another individual to secretly form, three additional business entities with the apparent intent to compete against Nanobeak: Animal Breath Analytics Inc., which was formed in October 2019 as a Florida corporation; Go Blue Biotech, Inc., which was formed in November of 2019 as a Delaware corporation; and JBCSJS LLC, which was formed in January 2020 as a Florida LLC. Additionally, around the time of his removal as a director, Barbera worked with others to form Animal Breath Analytics Corporation, which was formed in March 2020 as a Nevada corporation; (collectively, the "New Business Entities"). Based on Barbera's refusal to return the Books and Records or the Confidential Information, and on information and belief, it appears that Barbera has used or intends to use Nanobeak's Confidential Information for the advancement of these new entities. In addition, on information and belief, Barbera has recently solicited Nanobeak shareholders to invest in his Go Blue Biotech Inc.

77.     Taking into account Barbera's history of claiming that he has lost data through "hard drive crashes," as well as Barbera's formation of the New Business Entities, Barbera's claim that he no longer has access to the Confidential Information or the Books and Records is entirely implausible. Rather, on information and belief, Barbera is wrongfully refusing to return the Books and Records and the Confidential Information, causing substantial harm to Nanobeak

78.     As a fiduciary of Nanobeak who obtained possession of and access to the Books and Records and the Confidential Information based on his position of trust and confidence with the Corporation, his refusal to even restore the Corporation's own information is an extreme deviation from the standards of care, duty, and loyalty expected of members of a corporation's board of directors.

79.     Thus, even if Barbera has not used the Confidential Information to advance the New Entities' business objectives, his wrongful refusal to return it to Nanobeak is a breach of his fiduciary duties of care and loyalty.

## VI.     Nanobeak's Efforts to Recover Funds and Property After Barbera's Termination

80.     Following Barbera's termination as an officer and director, the Corporation transmitted a letter to Barbera requesting that he, among other things, immediately:

(i)      provide the Corporation with access to "ALL bank accounts that include the name Nanobeak or are related to the business of [Nanobeak] in any manner;

(ii)     return all computers, laptops, notebooks, cell phones, and any other technology that contains information relating to [Nanobeak];

(iii)    provide full access to all Nanobeak email accounts; and

(iv)    transfer the University C License back to Nanobeak.

81.     The Corporation also offered to work with Barbera to develop an equitable plan for Barbera to reimburse Nanobeak for all of the funds that he had unlawfully converted. As

– 23 –

proposed by the Corporation, the plan would provide for Barbera to "reimburse [Nanobeak] for [its] funds used (i) to pay expenses to any party that did not relate to [Nanobeak's] business, or (ii) to reimburse [Barbera] or any of [his] affiliates for non-[Nanobeak] business."

82. The Corporation made this offer to avoid the need for litigation, but Barbera flatly refused the Corporation's reasonable offer of a compromise.

83. Barbera has failed to even recognize that his conduct was wrongful. Indeed, Barbera has in effect claimed that he lacked any fiduciary duties to Nanobeak and was entitled to use its funds for his own, personal ends. He has specifically claimed, in correspondence to the Corporation, that Nanobeak "was an extension of [him]self" and that "the separation between myself and the company was always somewhat blurred." Thus, Barbera's conduct since his termination, like his conduct as an officer and director of Nanobeak, demonstrates a total and willful disregard for his fiduciary duties to the Corporation.

84. Despite his termination as a Nanobeak director and officer, Barbera has continued to hold himself out as associated with the Corporation, including on his LinkedIn profile and his personal website. Nanobeak has demanded that Barbera remove any reference to an ongoing relationship with Nanobeak in any communications with investors or the public, but Barbera has wrongfully refused.

85. On August 31, 2020, Nanobeak commenced litigation against Barbera in the United States District Court for the Southern District of New York (the "Federal Court Action") bringing substantially similar claims as those raised in Counts I–IV of this Complaint as well as a federal statutory claim relating to Barbera's theft of Nanobeak's computer systems.  By order dated April 13, 2021, the Southern District of New York dismissed the federal statutory claim and declined to exercise jurisdiction over the remaining claims asserted in the Federal Court

Action pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the limitations period for any claim asserted in the Federal Court Action was tolled by operation of federal law from August 31, 2020, until May 13, 2021. *See* 28 U.S.C. § 1367(d).

## COUNT I

### Breach of Fiduciary Duty

86.     Plaintiff repeats each and every allegation contained above and below as if set forth fully herein.

87.     Upon the formation of Nanobeak and until his termination as a director and officer of Nanobeak in March 2020 and April 2020, respectively, Barbera owed fiduciary duties of care, loyalty, and good faith to Nanobeak.

88.     By using his position as a fiduciary to enrich himself at Nanobeak's expense and enrich third-parties for no legitimate business purpose, Barbera breached his fiduciary duties of care, loyalty, and good faith to Nanobeak.

89.     By stealing, embezzling, and converting Nanobeak's property for his own use and the use of third parties, and by causing Nanobeak to borrow funds from lenders at punitive interest rates, Barbera breached his fiduciary duties of care, loyalty, and good faith to Nanobeak.

90.     Barbera owed fiduciary duties of care and loyalty to the Corporation with respect to all moneys that he raised from Nanobeak investors. Yet, the evidence available to Nanobeak suggests that Barbera converted investor funds by diverting them into non-Nanobeak bank accounts and commingled them with Barbera's own funds. Barbera is liable to the Corporation for the full amount of all funds not returned in breach of his fiduciary duties.

91.    Barbera engaged in this conduct willfully and intentionally, with the knowledge and understanding that it would harm Nanobeak financially, harm its ability to accomplish its business objectives, and damage its ability to raise capital.

92.    Barbera's conduct was willful, wanton and outrageous, thereby justifying an award of punitive or exemplary damages.

## COUNT II

## Fraud

93.    Plaintiff repeats each and every allegation contained above and below as if set forth fully herein.

94.    Upon the formation of Nanobeak in 2009 and until his termination as a director and officer of Nanobeak March 2020 and April 2020, respectively, Barbera owed fiduciary duties of care, loyalty, and good faith to Nanobeak. These fiduciary duties required Barbera to, among other things, deal with Nanobeak and its board of directors truthfully and with candor.

95.    As alleged above, Barbera made misrepresentations to Nanobeak's Board concerning Nanobeak's overall financial position and the payments from the Corporation by which he enriched himself and third parties at the Corporation's expense.

96.    Until his resignation as CEO in October 2019, Nanobeak and its board of directors reasonably relied upon the truth, accuracy, and completeness of Barbera's statements and other representations concerning the financial position of the Corporation in exercising its authority to govern Nanobeak's affairs and, in particular to determine whether Barbera should remain in his position as Nanobeak's CEO.

97.    These misrepresentations and omissions were, individually and in the aggregate, material to the Board's decision to retain Barbera as Nanobeak's CEO and authorize him to act

– 26 –

on behalf of the Corporation. Had the Board been informed of Barbera's conversion and wasteful

spending, the Board would have removed him from that position immediately.

98.     Even after Barbera's resignation as Nanobeak's Chief Executive Officer, Barbera

refused requests from Nanobeak's new management and its board of directors to return the

Books and Records. This refusal to return Nanobeak's own property was deliberately undertaken

to prevent Nanobeak and its board of directors from investigating and learning the full truth

about Barbera's misconduct.

99.     As a result of Barbera's series of misrepresentations and omissions, Nanobeak has

sustained damages resulting directly from Barbera's theft from the Corporation. Nanobeak has

also sustained damages in the form of fees for the retention of professionals to investigate

Barbera's fraud, which fees were substantially increased as a result of Barbera's concealment of

Nanobeak's books and records.

100.     Barbera's conduct was willful, wanton and outrageous, thereby justifying an

award of punitive or exemplary damages.

### COUNT III

### Conversion

101.     Plaintiff repeats each and every allegation contained above and below as if set

forth fully herein.

102.     At all times relevant, Nanobeak was the true and lawful owner of the funds held

in its own bank accounts, the Confidential Information, the Nanobeak Systems, the Nanobeak

Domains, the Nanobeak Hosting Accounts, and the Books and Records (the "Nanobeak

Property"). Barbera's possessory interests in the Nanobeak Property was entirely contingent on

his status as a fiduciary of Nanobeak, and therefore was subject to the duties of care, loyalty, and good faith imposed by law.

103.     As outlined above, Barbera exercised dominion and control over the Nanobeak Property inconsistent with his limited possessory interest in such property, including by transferring the Nanobeak Property to third parties for no legitimate business purpose, claiming ownership of the Nanobeak Property, and refusing to return the Nanobeak Property upon the demand of the Corporation. Such exercise of dominion and control constituted illegal conversion and theft.

104.     As a direct and proximate result of Barbera's conversion, Nanobeak has sustained substantial damages in an amount to be determined at trial, and in particular by retaining the Books and Records, Barbera has frustrated Nanobeak's attempts to determine the full extent of those damages.

105.     Barbera's conduct was willful, wanton and outrageous, thereby justifying an award of punitive or exemplary damages.

## COUNT IV

### Accounting and Imposition of a Constructive Trust

106.     Plaintiff repeats each and every allegation contained above and below as if set forth fully herein.

107.     From the formation of Nanobeak until his termination as a Nanobeak director and its CSO in March 2020 and April 2020, respectively, Barbera owed fiduciary duties to Nanobeak as a result of his positions as a director and officer of the Corporation.

108.     The amount that Barbera owes to Nanobeak is currently unknown and cannot be ascertained without an accounting from Barbera of the revenues and profits realized by Barbera.

109. On information and belief, the total amount due to Nanobeak as a result of Barbera's unauthorized personal expenses and corporate waste is at least $5.2 million, representing the total of the Personal Expenses, the Personal Legal Expenses, the Ukraine Transfers, and the Merchant Advance Losses. In addition, Barbera caused Nanobeak to pay the Unknown Expenses, which totaled to $4,404,971.97.

110. In addition, on information and belief, Barbera has unlawfully retained Nanobeak funds that were paid by investors. As Barbera owed fiduciary duties of care and loyalty to the Corporation with respect to all moneys that he raised from Nanobeak investors, Barbera is liable to the Corporation for the full amount of all funds not paid in full to Nanobeak.

111. Equity demands that Barbera be required to fully and intelligently account for all revenues and profits realized from the unlawful acts alleged of herein and for Barbera's handling of all Nanobeak property during his time as an officer or director of Nanobeak.

112. As a result of Barbera's fraudulent conduct, including Barbera's conversion of Nanobeak property, Nanobeak seeks an accounting of Barbera's use of Nanobeak's funds (including for the Personal Expenses, the Personal Legal Expenses, the Ukraine Transfers, the Merchant Advance Losses, and the Unknown Expenses), the imposition of a constructive trust over misappropriated property held by Barbera, and the disgorgement of all profits realized by Barbera from the date of the inception up through and including the present.

– 29 –

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.    ordering Barbera to return the Books and Records, as well as all Nanobeak
      Systems and the Confidential Information, to Nanobeak, without retaining any
      copies or duplicates thereof;

B.    ordering Barbera to return the University C License, and any information obtained
      from that license, to Nanobeak;

C.    ordering Barbera to restore access to the Domain and the Nanobeak Hosting
      Accounts to Nanobeak;

D.    against Barbera awarding compensatory damages in favor of Nanobeak as a result
      of Barbera's conversion, multiple breaches of fiduciary duties, and fraud, in an
      amount to be proven at trial, but in no event less than $5,204,572.82, plus interest
      thereon;

E.    against Barbera awarding punitive and exemplary damages in an amount to be
      determined at trial;

F.    entering a temporary, preliminary, and permanent injunction against Barbera
      barring him from accessing the Nanobeak Systems or using the Confidential
      Information stored thereon;

G.    entering a temporary, preliminary, and permanent injunction against Barbera
      barring him from exploiting the Confidential Information or disseminating it to
      third parties;

H.    granting equitable relief against Barbera in the form of the imposition of a
      constructive trust, accounting and a disgorgement of profits and other benefits
      received by reason of his unlawful conduct;

I.    awarding Nanobeak its attorneys' fees and costs for this Action, as well as for the
      investigation of Barbera's misconduct; and

J.    granting Nanobeak such other and further relief as the Court deems just, proper
      and equitable.

## JURY TRIAL DEMAND

Pursuant to CPLR § 4102, plaintiff Nanobeak hereby demands a trial by jury on all issues

so triable contained in the Complaint.

Dated:     New York, New York
           April 20, 2021

DECHERT LLP

By: _____
          Paul Curran Kingsbery

Michael J. Gilbert
Paul Curran Kingsbery
1095 Avenue of the Americas
New York, New York 10036
michael.gilbert@dechert.com
paul.kingsbery@dechet.com
+1 212 698 3500

*Attorneys for Plaintiff Nanobeak Biotech Inc.*

# Exhibit J

Docket No. 9 in
D&O Action

# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 06/04/2021 01:06 PM
NYSCEF DOC. NO. 9    Case 1:21-cr-00154-JGK   Document 1   Filed 12/08/20   Page 1 of 22

INDEX NO. 652646/2021
RECEIVED NYSCEF: 06/04/2021

Approved: _____
JOSHUA A. NAFTALIS
Assistant United States Attorney

Before:    HON. SARAH NETBURN
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - - x

## 20 MAG 13097

UNITED STATES OF AMERICA          :    **SEALED COMPLAINT**

       - v. -                     :    Violations of 15 U.S.C.
                                       §§ 78j(b) and 78ff; 17 C.F.R.
JAMES JEREMY BARBERA,             :    § 240.10b-5; and 18 U.S.C.
                                       §§ 371, 1343, and 2.
                 Defendant.       :
                                       COUNTY OF OFFENSES: NEW YORK

- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

       JONATHAN H. POLONITZA, being duly sworn, deposes and
says that he is a Special Agent with the Federal Bureau of
Investigation ("FBI") and charges as follows:

### COUNT ONE

### (Conspiracy to Commit Securities Fraud and Wire Fraud)

       1.    From at least in or about 2013 through in or about
2020, in the Southern District of New York and elsewhere, JAMES
JEREMY BARBERA, the defendant, and others known and unknown,
willfully and knowingly did combine, conspire, confederate, and
agree together and with each other to commit offenses against the
United States, to wit, securities fraud, in violation of Title 15,
United States Code, Sections 78j(b) and 78ff, and Title 17, Code
of Federal Regulations, Section 240.10b-5, and wire fraud, in
violation of Title 18, United States Code, Section 1343.

       2.    It was a part and an object of the conspiracy that
JAMES JEREMY BARBERA, the defendant, and others known and unknown,
willfully and knowingly, directly and indirectly, by use of the
means and instrumentalities of interstate commerce, and of the
mails, and the facilities of national securities exchanges, would
and did use and employ manipulative and deceptive devices and
contrivances, in connection with the purchase and sale of
securities, in violation of Title 17, Code of Federal Regulations,

Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

3.   It was a further part and an object of the conspiracy that JAMES JEREMY BARBERA, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>Overt Acts</u>

4.   In furtherance of the conspiracy and to effect its illegal objects, JAMES JEREMY BARBERA, the defendant, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about June 8, 2016, BARBERA used approximately $7,440 in money raised from investors in Company 2, a privately held biotechnology company, to pay the tuition for his child's private school in New York, New York.

b.   On or about August 31, 2018, BARBERA used approximately $11,230 in money raised from investors in Company 2 to pay the mortgage on his apartment on Central Park West in New York, New York.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud)

5.   From at least in or about 2013 through in or about 2020, in the Southern District of New York and elsewhere, JAMES JEREMY BARBERA, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, BARBERA made material misrepresentations and omissions to investors, and misappropriated investor funds for his own use.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

## COUNT THREE

### (Wire Fraud)

6.   From at least in or about 2013 through in or about 2020, in the Southern District of New York and elsewhere, JAMES JEREMY BARBERA, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BARBERA, through the use of interstate wire communications, made material misrepresentations and omissions to investors, and misappropriated investor funds for his own use.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

7. I have been a Special Agent with the FBI for approximately ten years. I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses. I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of individuals for participating in such offenses.

8. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including documents and information provided to me by others. The documents and information include, but are not limited to, documents provided by Company 2, the National Aeronautics and Space Administration ("NASA"), and Company 2 investors; bank records for accounts associated with JAMES JEREMY BARBERA, the defendant, and Company 2; videos and consensual recordings; and public records from the Securities and Exchange Commission (the "SEC"), and the States of California and Delaware (collectively, the "Records"). Because this affidavit is prepared for the limited purpose of establishing probable cause, I have not set forth each and every fact that I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

## Relevant Entities and Individuals

9. Based upon my review of the Records and my interviews of witnesses, I have learned the following, in substance and in part:

a. At all times relevant to this Complaint, JAMES JEREMY BARBERA, the defendant, resided in New York, New York. At certain times relevant to this Complaint, BARBERA was the Chief Executive Officer ("CEO") of three companies, Company 1, Company 2, and Company 3, which, as discussed below, had various intertwined and overlapping relationships.

b. From in or about 1997 through in or about July 2014, BARBERA was the Chairman and CEO of Company 1, a publicly traded company based in New York, New York, that purported to be,

among other things, a nanotechnology company.[1]  At certain times
relevant to this Complaint, Company 1's common stock traded on the
OTC Bulletin Board, an over-the-counter securities market located
in New York, New York.

       c.   On or about August 19, 2009, Company 1
publicly announced that it had formed Company 2 as a purported
subsidiary that, using NASA technology, focused on carbon based
chemical sensing for gas and organic vapor detection in human
breath.  On or about November 9, 2009, BARBERA incorporated Company
2 in California.  Contrary to Company 1's public statements,
Company 2's incorporation documents reflect that BARBERA owned
Company 2.

       d.   On or about June 7, 2011, the SEC announced
that it had suspended trading in Company 1's stock, as well as the
stock of 16 other companies, as part of a "broad effort to combat
microcap stock fraud."  The SEC explained it had halted trading in
these issuers "because of questions regarding the adequacy and
accuracy of information about the companies, including their
assets, business operations, current financial condition and/or
issuances of shares in company stock."

       e.   In or about November 2013, BARBERA became the
CEO of Company 3, a publicly traded, biotechnology company located
in New York, New York, which was founded in or about 2010.  Company
3's common stock traded on the OTCQB, an over-the-counter
securities market located in New York, New York.  In or about
November 2013, Company 3 publicly announced in its filings with
the SEC that Company 2 had acquired a controlling interest in
Company 3, and that the two companies were working together to
develop a breathalyzer sensor technology, based on NASA
technology.  In or about January 2015, Company 3 moved its offices
to the same address in New York, New York as Company 2.  In or
about August 2015, Company 3 changed its name to one similar to
Company 2's name.

       f.   On or about July 29, 2014, the SEC announced
the settlement of federal securities fraud charges against BARBERA

---

    1.   Based on my review of public documents, I have learned
that nanotechnology is a field of applied science and technology
whose unifying theme is the control of matter on the molecular
level in scales smaller than 1 micrometre, normally 1 to 100
nanometers, and the fabrication of devices within that size range.

and Company 1 for making materially false and misleading statements about the true business operations and finances of Company 1 (the "SEC Fraud Settlement"). The SEC alleged that, while BARBERA had "portray[ed] [Company 1] as a rapidly growing and hugely promising technology venture, [Company 1] remains essentially dormant with little or no capital." As part of the SEC Fraud Settlement, BARBERA consented to entry of a final judgment permanently enjoining him from future violations of the antifraud provisions of the federal securities laws, agreed to pay a $100,000 penalty, and agreed to be permanently barred from acting as an officer or director of a public company or from participating in a penny stock offering. In or about July 2014, as a result of the SEC Fraud Settlement and related ban, BARBERA stopped serving as the CEO of both Company 1 and Company 3.

g. A few weeks later, on or about August 12, 2014, Company 2 merged into a Delaware corporation. Company 2 represented to investors it had developed a breathalyzer sensor technology that could detect cancer and narcotics in human breath, based on technology developed by NASA, and that it was also partnered with a major U.S. research university ("University 1"). From in or about 2009 through in or about October 2019 BARBERA was Company 2's CEO. In or about October 2019, under pressure from Company 2's board of directors, BARBERA resigned as CEO and became Company 2's Chief Science Officer. Company 2's board suspended BARBERA in or about December 2019, and terminated BARBERA in or about April 2020.

h. In or about October 2019, BARBERA and a co-conspirator not named herein ("CC-1") co-founded Company 4, a Florida corporation, which had purportedly developed a breathalyzer sensor technology that, based on Company 2's and NASA's technology, could detect diseases from organic compounds in an animal's breath. Thereafter, BARBERA and CC-1 incorporated other companies together.

i. NASA is an independent U.S. government agency responsible for the civilian space program, as well as aeronautics and aerospace research. One of NASA's facilities is the Ames Research Center at Moffett Field in Silicon Valley, California ("NASA Ames").